GEORGE WEEMS WILLIAMS ET AL.

*vs.*

MAYOR AND CITY COUNCIL OF BALTIMORE
CITY.

*Baltimore City: Park Board and Board of Estimates; control
of parks; injunctions; municipal corporations.*

The right to an injunction is not *ex debito justitiæ;* the
application can be only to the sound discretion of the court,
acting upon all the circumstances of the particular case.

pp. 157, 158

An injunction to restrain *ultra vires* or illegal acts of a mu-
nicipal corporation will not be granted at the instance of a tax-
payer, unless it appears that he would be injured by the acts
complained of.    p. 158

The Board of Estimates of Baltimore City has no powers or
duties in respect of the public parks.    p. 159

Under Ordinance No. 60, approved July 21st, 1860, and con-
firmed by sub-section 16 and section 91 of the City Charter,
the charge and control of the parks is vested in the Park Board.

p. 159

The National Government ceded Fort McHenry to Baltimore
City for park purposes; it sold to the City one of the buildings
the site of which had been reserved for an immigrant station;
a dispute arose between the Park Board (which has jurisdiction
over the city parks) and the city as to the place to which the
said building should be moved; upon application for an injunc-
tion to restrain the city and its Board of Estimates from mov-

ing the building it was: *Held,* that the writ should not issue:
the building had already been removed, and it was: *Held,* that,
unless the building had been removed the Government would
have torn it down; and it was further: *Held,* that the preserva-
tion of the public property by removing it had not been made
to appear to be such an injury to the taxpayers as would justify
the granting of the injunction.                    p. 159

*Decided February 10th, 1916.*

Appeal from Circuit Court No. 2 of Baltimore City.
(HEUISLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE,
BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CON-
STABLE, JJ.

*George Weems Williams,* for the appellants.

*S. S. Field, the City Solicitor of Baltimore City,* and
*Ed. J. Colgan, Jr., the Assistant City Solicitor,* for the
appellee.

BURKE, J., delivered the opinion of the Court.

This case grows out of a controversy between the Board
of Park Commissioners and the Board of Estimates of Bal-
timore City,—two of the boards of the municipal corpora-
tion,—respecting the control and management of one of the
public parks of the city.   The plaintiffs constitute a ma-
jority of the Board of Park Commissioners,—four of the
five members of that Board,—and were authorized to file the
bill in this case by resolution of the Board.   They also sue
individually as residents and taxpayers of Baltimore City.
The bill is filed against the Mayor and City Council of
Baltimore and the Board of Estimates.   In so far as it

seeks any relief against the municipal corporation for the
acts complained of, it is obvious that the bill can not be
maintained for the simple reason that the corporation as such
has done nothing to cause or bring about the situation com-
plained of in the bill.  The acts complained of were done
by the Board of Estimates, and there is nothing to show that
the corporation itself contributed to create the condition
which gave rise to the suit.

The bill and answer are quite full, but it is unnecessary
to set out the respective contentions of the parties by quot-
ing at any length from the pleadings, which suggest a num-
ber of interesting legal questions.  For the real questions
which must control the case lie within a narrow limit and
are, we think, free of difficulty.  The controlling facts dis-
closed by the record may be briefly stated.  Pursuant to an
Act of Congress, approved by the President on May 26th,
1914, and an ordinance of the Mayor and City Council of
Baltimore (No. 471), passed on June 17, 1914, the use of
a tract of land, comprising about thirty-eight acres, situated
on Locust Point in Baltimore City and known as Fort Mc-
Henry, was granted by the government of the United States
to the Mayor and City Council of Baltimore and accepted
by the City as a public park.  After its acceptance, the prop-
erty was placed in the charge and custody of the Board of
Park Commissioners.  A portion of the land of the Military
reservation at Fort McHenry was reserved by the United
States Government by the Act of Congress referred to for
an immigration station which the government was about to
construct at large expense.  On the land reserved by the
government as a site for the new immigration station there
was located a substantial frame building, worth approximately
five thousand dollars, which had been used as a "Canteen
Building" when Fort McHenry was used for military pur-
poses.  To make room for the building of the immigration
station it was necessary to tear down or remove this building.
The building was purchased by the Park Board from the
National Government for the sum of fifty dollars in Septem-

ber, 1914, to be used in connection with the park and paid
for out of the park funds, but the title to and ownership of
the building after its purchase were vested in the City.

After the building had been acquired by the City the
question arose as to the specific purpose for which it should
be used.  At the time of the acquisition of the building by
the City, and for many years prior thereto, there were a
number of boat clubs located at Ferry Bar.  The ground
upon which these clubs was located had been acquired by
the Western Maryland Railroad for use as terminal facili-
ties, and the clubs were desirous of securing better and more
permanent locations.  The ground on the south side of Fort
McHenry is admirably adapted for the location of boat
clubs.  It rises rapidly from the water, and the sloping hill-
sides afford opportunity for a large number of people to
witness boating, rowing, and other water sports.  It was
accordingly proposed that the boat clubs be located at Fort
McHenry.  It was thought regattas and other aquatic sports
would popularize the park and furnish entertainment to
great numbers of the people of Baltimore, and by attracting
people from other States would advertise the City.  This
proposal was favorably received by the boat clubs and by
the Board of Estimates, and was taken under consideration
by the Board of Park Commissioners.  A committee was
appointed, of which Mr. Williams, the president of the Park
Board, was a member, to arrange the details of an agree-
ment to be entered into between the boat clubs and the City
under which they might remove and locate at Fort McHenry.
After numerous meetings of the committee the final draft
of the agreement was prepared fixing the terms and condi-
tions,—a number of which being suggested by Mr. Wil-
liams,—upon which the boat clubs might remove and locate
at Fort McHenry.  Mr. Williams was personally favorable
to the removal and approved the terms of the proposed agree-
ment, embodied in the final draft; but he was at all times
careful to have it understood what he did was not intended
to bind the Board of Park Commissioners.  He testified:

"My object in getting on that committee was, that my mind was not made up as to whether the boat club proposition was good or bad. * * * I went on the committee, and I was very careful until, I think, I got to be a perfect bore on the subject, that any suggestion I made was not intended to bind the Board."

(Mr. Colgan) : What Board are you referring to ? (Witness) : The Park Board. (Witness—continuing) : My idea was, and I think the idea .of the committee was to get the best proposition from the boat clubs that could be gotten, so that when the discussion took place it would be on something that was substantial and concrete, rather than have just a mass-meeting of ten or fifteen gentlemen and nothing ready before us. Now, on the third of December—I think by December second, Mr. McCay who was on the committee— the committee was as I remember, Mr. McCay, myself and four representatives from the four boat clubs—sent me a report and I sent it back with suggestions and I told them that I concurred in it, but that I could not bind the Board. Then around the last of January, 1915, the draft of the agreement was sent me, I distributed copies of it to the members of the Board and we had a number of meetings."

It was contemplated that the agreement should be signed by the boat clubs, the Mayor and City Council of Baltimore, by the hand of Mr. Preston, Mayor, and approved by the Board of Park Commissioners and the Board of Estimates. It was executed by the boat clubs, but not by the Mayor, · nor was it approved by the Board of Park Commissioners or Board of Estimates. The final draft of the agreement, which it was proposed should be signed by each of the above named parties, is here inserted:

"This Agreement, Made this              day of January, in the year nineteen hundred and fifteen, between the Mayor and City Council of Baltimore and the following Boat Clubs, all of which are incorporated, namely: Arundel Boat Club, Corinthian Yacht Club, Maryland Motor Boat Club, and Ariel Rowing Club:

"Witnesseth, That whereas the said four Clubs have for a number of years past had their respective Club Houses located at Ferry Bar, in the City of Baltimore, and were occupying the ground under leases for short terms; and

"Whereas the Mayor and City Council of Baltimore has recently secured from the United States of America the authority to use and improve Fort McHenry as a Public Park, with the riparian rights attached thereto, and the said Mayor and City Council, through its Ordinance of Estimates for the year 1915, has made appropriations for the improvement of Fort McHenry and the Water Front on the South side thereof, known as the 'Approach to Spring Gardens,' and it is contemplated that the City shall build a Breakwater extending from the point of Fort Mc-Henry into the Middle Branch of the Patapsco River, and thus furnish, on the south side of Fort McHenry and west of said Breakwater, a very desirable and suitable place for the location of Boat Club Houses, and the anchorage of pleasure boats of various kinds, and for the purpose of adding to the attraction of said Park and making said Park a popular Water Front Park, and to encourage the use of said Park for aquatic sports, the said Mayor and City Council of Baltimore has invited the said four Clubs to rent the portion of the space thus to be provided by the improvements above mentioned, shown on attached drawing, and the said four Clubs, desiring to do all in their power to make said Public Park a success, and to show their appreciation of the efforts of said Mayor and City Council to give them a desirable location therein, have agreed to rent the spaces thus to be provided, and which have been allotted to each of them, and by reason of the large cost in removing their buildings and making the necessary repairs thereto occasioned by said removal, said Clubs, and each of them, have requested the Mayor and City Council of Baltimore to assist them financially, and

the Mayor and City Council of Baltimore has agreed to do so, upon the following terms and stipulations hereinafter set forth:

"1. That the Arundel Boat Club's building be moved to the location shown on the accompanying blue print, and fixed up, at an expense estimated not to exceed five thousand dollars ($5,000.00).

"2. That the old Canteen Building, now on Fort McHenry, be moved to the location shown on the accompanying blue print, and remodelled for the use of the Corinthian Yacht Club, at a cost estimated not to exceed seven thousand dollars ($7,000.00).

"3. That the Maryland Motor Boat Club's building be moved to the location shown on the accompanying blue print, and be put in proper order, at a cost estimated not to exceed five thousand dollars ($5,-000.00).

"4. That the Ariel Rowing Club's building be moved to the location shown on the accompanying blue print, and fixed up, at an expense estimated not to exceed four thousand dollars ($4,000.00).

"All of the above work—that is, moving the Canteen Building for the Corinthian Yacht Club, and moving the buildings of the Arundel Boat Club, Maryland Motor Boat Club and the Ariel Rowing Club, building proper foundations for all of said buildings, and fixing them up in good order for the use of the Clubs, and to provide suitable landings—to be done by contracts awarded by the Board of Awards, in the usual way of City contracts, after public advertisement, upon specifications prepared by the City Engineer and approved by the Board of Park Commissioners, said specifications to be so prepared as to call for bids separately:

"1. Upon moving and placing on suitable foundations and wharves, provided by contractors, each of the buildings specified above.

"2. Upon making the proper alterations and repairs to each of said buildings.

"3.   Also upon all of said work, as a whole, with
the proviso in the specifications giving to the Board of
Awards the power to award the whole work or any
portion or portions thereof, to any bidder, and also
the right to reject any and all bids; the plans and
specifications for said buildings, repairs and improve-
ments to be prepared by C. R. Leland, Architect, here-
tofore selected by the Board of Awards, with the ap-
proval of the said Boat Clubs.

"It is Further Understood and Agreed, that if, after
said bids are all in, it should appear from said bids
and other incidental expenses, including the archi-
tect's commissions, that the total expenditure in con-
nection with the moving and relocating of said Boat
Club Houses would exceed twenty-five thousand dol-
lars ($25.000.00) then the Mayor and City Council
of Baltimore shall have the right to terminate this
contract, and thereafter be under no obligation what-
soever in the matter.

"In the event, however, that the City awards the
contracts for said work, then the payment for all of
said work will be made in the first instance by the
Mayor and City Council of Baltimore out of the ap-
propriation of fifty thousand dollars ($50,000.00)
made to the Board of Park Commissioners for im-
provements at Fort McHenry in the Ordinance of Es-
timates for 1915.

"Each of said Clubs, except the Corinthian Yacht
Club, will pay to the Mayor and City Council of Bal-
timore the following annual amounts, payable in quar-
terly installments in each year, accounting, as to each
Club, from the date when the building to be occupied
by each Club, and the improvements thereof hereby
contemplated, shall be completed, the same being cal-
culated to cover rental for the spaces occupied, inter-
est on the amounts advanced by the City and a sink-
ing fund to pay for the advances thus made—that is
to say: Each of said Clubs shall pay to the Mayor
and City Council of Baltimore 5% annually as inter-

est and to cover the use of the space occupied, and 7%
annually as a sinking fund to reimburse the City for
its outlay, or a total of 12% annually, to be paid for
twelve years by each Club, in quarterly installments,
accounting from the respective dates when the respec-
tive Club buildings and improvements are completed,
said 12% to be calculated upon the actual amount
which may be expended by the Mayor and City Coun-
cil of Baltimore, as above provided, in moving and
improving the buildings and providing landings, etc.,
for the use of said Clubs respectively, as hereinabove
provided.

"These provisions as to payment are also to apply
to the Corinthian Yacht Club, with the exception that
the Corinthian Yacht Club will pay 5% annually to
cover interest and rental for the space occupied and
3% annually for the sinking fund to reimburse the
City for its advances, or a total of 8% annually, and
will pay said 8% for a period of eighteen years, in
quarterly installments.

"And it is Further Herein Provided and Agreed,
That upon the removal of the buildings of the Arun-
del Boat Club, Maryland Motor Boat Club, and the
Ariel Rowing Club to their respective locations at Fort
McHenry, as designated upon the drawing hereunto
annexed, the absolute title in and to said buildings
(but not their contents) shall vest in the Mayor and
City Council of Baltimore and be and become the
property of said Mayor and City Council of Balti-
more, with the right of each of said Clubs to use and
occupy same, in strict accordance with the terms here-
of, as the tenants of the said Mayor and City Council
of Baltimore, it being agreed that so long as said
Clubs shall occupy the said buildings as tenants, in
pursuance hereof, the said Clubs will keep their re-
spective buildings in good order and repair, but when,
and as often as, the said Club Houses may need paint-
ing on the outside, the Mayor and City Council of

Baltimore will furnish the material and the Clubs will furnish the labor for doing said painting.

"It is Further Hereby Agreed, That, in addition to the payments hereinabove specified, each of said Clubs will pay the Mayor and City Council of Baltimore, in the event of an increase in their respective memberships, the sum of one dollar ($1.00) per annum per member, for such increase, the increase to be ascertained as follows:

"On the first days of January and July, in every year, beginning with the year 1915, the Clubs will report their membership and will pay the said sum of one dollar ($1.00) per annum for such increase in membership as may be represented by the difference between the present membership and the average which will be shown by adding the membership on January 1st and July 1st in each year and dividing it by 2; it being hereby agreed that the present membership of each of said Clubs is as follows:

Arundel Boat Club......................250
Corinthian Yacht Club...................100
Maryland Motor Boat Club...............150
Ariel Rowing Club......................250

"It being, however, understood and agreed that before this payment of one dollar ($1.00) per annum per member attaches to the Corinthian Yacht Club it shall be permitted to have fifty (50) additional members—that is to say: That it will pay annually on the excess above 150 members; and, in like manner, before this provision attaches to the Maryland Motor Boat Club it shall be permitted to get fifty (50) additional members, and the payment hereinabove specified to apply, as to that Club, only to the excess above 200 members.

"It is Further Hereby Understood and Agreed, That each of said Clubs will indemnify and save the Mayor and City Council of Baltimore and the Board of Park Commissioners harmless from any and all claims for damages which may be caused by any act, negligence

or default of any of said Clubs, or any of the members of said Clubs, in or about the Club Houses and landings herein referred to.

"It is Further Hereby Understood and Agreed, That this entire contract is subject to the possibility of United States Government retaking possession of Fort McHenry and the grounds on which the Club Houses · are hereby contemplated to be placed; in which event this contract will be terminated, and neither party will be liable to the other except to the date of such termination.

"In the event that either or any of said Clubs shall fail to make the payments herein required to be made by each of them to the Mayor and City Council of Baltimore, the said Mayor and City Council of Baltimore, shall have the right to distrain upon any of the property of said Club so in default, and sell the same, or pursue any ordinary remedy for the recovery of the amount so due, or terminate the agreement and take possession of the Club building, and have the right to use either or all of said remedies at the option of the said Mayor and City Council of Baltimore.

"It is Further Understood and Agreed, That the Mayor and City Council of Baltimore shall have the right, either through regulations of the Park Board, approved by the Board of Estimates, or by Ordinance, to make all reasonable and proper regulations in reference to the use of said Club Buildings and the conduct of the members of said Clubs, respectively, and to impose appropriate liquidated damages or penalties for the violations of such rules and regulations, and also with the right, for repeated violations of said rules and regulations, to cancel the contract and take possession of the Club House of the Club to which the member so offending belongs.

"It is Further Understood and Agreed, That the members of each of said Clubs shall have the right to the use of said protected water for the mooring of boats of said Clubs or their members under such rea-

sonable rules and regulations as may be prescribed by
Ordinance, or by the Harbor Board, with the approval
of the Board of Estimates, without any charge.

"And it is Further Understood and Agreed, That at
the expiration of the twelve years provided for in this
contract, as to three of said Clubs, and of the eighteen
years as to the fourth, the said Clubs and each of them
shall pay to the Mayor and City Council of Baltimore
the annual rental, as tenants from year to year, of
five hundred dollars ($500.00) per year, in quarterly
installments, for the use and privilege of the buildings
and spaces occupied by the respective Clubs, said ten-
ancy from year to year to continue during the pleas-
ure of the City, the City having the right to terminate
same upon giving ninety days' notice before the expi-
ration of any current year."

This agreement was disapproved by the Board of Park
Commissioners, and a dispute arose between it and the Board
of Estimates as to the removal of the building, its location
in the Park and the use to which it should be devoted. The
Board of Estimates wanted it fitted up and used by the
Corinthian Yacht Club under the terms and conditions stated
in the final draft of the agreement above set out; the Board
of Park Commissioners wanted it located at a different site
in the Park and used for a different purpose. Pending this
dispute the United States Government was insisting that the
building be removed from the site of the immigration sta-
tion in order that it might proceed with its work there. The
Board of Park Commissioners proposed to surrender the
building to the Government in which event it would be
destroyed. It was the property of the City and was of con-
siderable value, and the Board of Estimates wanted to pre-
serve it.

On June 11, 1915, it addressed a letter to Mr. William S.
Manning, General Superintendent of Public Parks, notify-
ing him "to arrange with the lowest bidder to move the Old
Canteen Building from its present location, where it inter-

feres with the proposed plans of the Immigration Commission, over to any point that may be selected by the Board of Park Commissioners south of the row of houses which fronts on the main entrance of the fort, and allow this Canteen Building to remain standing at this location until its final location is determined. Two locations have been marked in red, 'A' and 'B,' on the enclosed blueprint, which would not interfere with any of the present improvements at Fort McHenry or be unsightly, and from either of these two points it would not be difficult to transport the building to its final location." In its reply to this letter, the Board of Park Commissioners in a letter dated June 19, 1915, stated that after full discussion it was the sense of the Board that it would be inadvisable to move the building to a temporary location. It stated that "the cost of removal to a temporary location would be substantially the same as moving the building to a final location and in addition there would probably be an additional cost for shoring up the building in the temporary location. Our judgment is that the Canteen Building should be used for public recreational activities— including dancing and swimming—and if so used it should be located at the location mentioned in Mr. Manning's letter to you of May 25th. This location would be the most convenient one if the building is to be devoted to the purpose above mentioned because of its nearness to the entrance of Fort McHenry; and also because of its proximity to what would be the natural place to be selected for a bathing beach.

"Under these circumstances we do not think that it would be expedient to remove the building to either of the points 'A' and 'B' mentioned in your letter. If this suggestion of ours as to location does not meet with your approval, upon re-consideration of the topic we would suggest that in view of the desire of the Federal Government to obtain immediate possession of the site for the Immigration Station that we give up our contract for the purchase of this building so that the Government may demolish or remove this building

.as it sees fit in order to make room for the new improve-
.ments."

The Board of Estimates disapproved of the location of the
building selected by the Board of Park Commissioners, and
approved the location selected by the City Engineer. It op-
posed the surrender of the building to the Government, and
took up directly with the Federal authorities the question of
its removal. The differences between the two boards being
irreconcilable, the Board of Estimates determined, against
the wishes of the Board of Park Commissioners, to move
the building to the place of its own selection at the expense
of the Contingent Fund. The following extracts from the
Minutes of the Board of Estimates are hereby transcribed:
"June 30, 1915—The Clerk was directed to notify the City
Engineer to have the Old Canteen Building at Fort McHenry
moved to its final location heretofore determined by the
Board of Estimates, and to notify the Secretary of War that
the City has contracted for the removal of the buildings.
The work is to be done by Thos. F. Spicknall and the ex-
pense is to be charged to the Contingent Fund. July 6,
1915—The City Engineer's recommendation of July 6th,
was approved that he award contract to Thos. S. Spicknall
& Son for $2,135.00 for removing the Old Canteen Build-
ing at Fort McHenry, and also contract for approximately
$1800 for installing the necessary foundation and brick wall
to receive the building and bring same up to proper eleva-
tion, as required by the Boat House scheme, making a total
of $3,935.00, which is to be charged to the Contingent Fund.
The City Engineer was authorized to proceed with this work
at once without the formality of advertising and awarding
of contract by the Board of Awards, because of the emer-
gency of the case, the U. S. Government requiring imme-
.diate action."

Foundations were prepared for the reception of the build-
ing, and the contractor began its removal under the super-
vision of the City Engineer. In removing the building it
became necessary to change two arc light wires in the Park.

Before changing these wires the City Engineer requested
the Superintendent of Parks to raise the wires or give him
permission to do so, but this request was refused. Mr. Field
testified that in order to prevent the building from being
torn down by the National Government or else if that was
not done to run the risk possibly of losing the Immigration
Station, "the Board of Estimates decided that they would
take the necessary money out of their Contingent Fund and
move the building over to the south side of Fort McHenry
where it could be used for the boat clubs, and then we
expected in some way provision would be made next year
in the Ordinance of Estimates for putting these boat club
buildings all down there and putting them in shape and
moving those boat clubs to this beautiful Riverside Park. I
do not say it is very beautiful now, but it can be made very
beautiful on a very high bluff overlooking the river for miles.
It is the only riverside park in Baltimore, and it is a great
thing for the city, in my judgment, to get that valuable land
from the Government without costing us anything, and every
member of the Board thought that it would be a great addi-
tion to the park, greatly popularizing the park, and making
it very much more enjoyable for the public who would go
to the park if they could have these boat clubs down there."
Mayor Preston, in his testimony, said: "The situation about
the Canteen Building was this: we had agreed with the
Government, we had purchased the building for something
like fifty dollars. I had had a good deal of correspondence
with the Secretary of War and the Quartermaster General,.
and they were hurrying it and they wanted to award the
contract, and they intimated to me that the presence of the
Canteen Building there was interfering with the awarding
of the contract, and they pinned me down to the question of
when we could get it away, and I said in thirty days, and
I notified them again it could not be done in that time, and
the contract for this big structure there was largely depend-
ent on the removal of that building. We felt that the Park
Board would not go along with us. I felt that I was under

WILLIAMS vs. M. & C. C. OF BALTO.    155

Md.] .    Opinion of the Court.

written obligation with the Government to get that building out of the way—and the correspondence will show that— show that we had to do something; show we did award a contract for the removal of the building to the waterfront, and it was our understanding that it had been agreed upon, and when it was gotten off the site of the Immigration Pier, this application was filed by the Park Board for an injunction, and there it is now held up; a most unseemly position, a controversy between the City and one of its boards as to how an old abandoned building, where it shall be put, it seems to me a most unseemly controversy over a very small thing. We had to move to keep faith with the Government to get that building off the site. They wanted to use the site for the building they were constructing, and every week or two I would get a letter to get rid of the building, to clear the site. Q. And that was the immediate reason why, I presume, the Board of Estimates passed its order directing the City Engineer to remove the building and charge the cost of the removal to the Contingent Fund? A. Yes. Q. You considered that suggestion in the nature of an emergency, I suppose? A. We had to do it in order to keep faith with the Government, and we got a very advantageous price and we are going to lose a good deal of money by failure to carry it out."

There has been no agreement to rent any part of the property to the boat clubs; no contract made for the removal or remodelling of the boat clubs, or the fitting up of this building for the use of the Corinthian Yacht Club. What was intended was to put the building upon the foundations prepared for it, and to do nothing more until this controversy was settled. They did, however, expect that in the future provision would be made in an Ordinance of Estimates for bringing all the boat clubs to the Park upon the terms provided for in the proposed agreement.

After the building had been removed for some distance upon and across the park the bill in this case was filed. The relief prayed for was:

1.    That the court "may establish and declare that neither the defendant corporation nor the Board of Estimates or any member thereof, or any City official or officials, acting in pursuance of instructions from said Board of Estimates or otherwise, have or had the right or power, without the consent of the Board of Park Commissioners, to move any building purchased out of park funds, or under the control of the Board of Park Commissioners, or to use or permit the use of such building for private purposes or uses, or to use public funds or property for the removal, relocation and repair of a public building for the use of any private club, association, corporation, individual or individuals."

2.    That the court "may establish and declare that neither the defendant corporation, nor the Board of Estimates, nor any City official other than the Board of Park Commissioners, have or had the right or power to move buildings across parks, or locate buildings in parks, or interfere in any wise, with the care and control of public parks vested by the law in the Board of Park Commissioners."

3.    "That the defendants and each of them, their officers, agents and employees may be enjoined and restrained by an injunction issuing out of this honorable court, from moving or permitting to be moved, the Canteen Building hereinbefore mentioned, across that portion of the said Fort McHenry tract dedicated by law to use as a public park, or from locating said building in any location in said public park area, or from using or permitting the use of said buildings or of any portion of said park area for or by any club, corporation, association or individual or individuals for private purposes, and from using, or permitting the use of public moneys for the removal of said Canteen Building, and the repair of the same for the use of any private club, association or corporation. That the defendants and each of them, their officers, agents and employees, be required by said injunction either

to remove said Canteen Building from said portion of said Fort McHenry tract dedicated by law to use as a public park, or else to remove it to a site to be selected by the Board of Park Commissioners, said building, if removed to said site so selected, to be used only for public recreational purposes."

On the 28th of September, 1915, the Circuit Court No. 2 of Baltimore City ordered "that a preliminary injunction be issued enjoining and restraining the defendants and each of them, their officers, agents and employees, and also any other persons or corporations employed by the defendants or any of them under contract, or otherwise, from moving or permitting to be moved, the said Canteen Building, across Fort McHenry Park, or from locating said building in any location in said park area, or from doing any work on any foundations or structures intended for the use of said building." An answer was filed by the defendants and testimony was taken in open Court, and on December 11, 1915, the Court passed an order dissolving the injunction and dismissing the bill, and ordered that the costs be paid by the defendants. From this order the plaintiffs have appealed. The brief of the appellees contains the terms of an agreement entered into between the parties by which it was provided that pending this appeal the defendants might move the Canteen Building from its present location and place it on the foundations prepared for it. But that agreement does not appear in the record. Its omission, however, does not change the legal or equitable rights of the parties.

The discussion in the brief and in the oral arguments relate to some questions which the record does not present and which it is not now necessary to decide. Keeping in mind the well established principles that the right to an injunction is not *ex debito justitiae,* and that the application for injunction is addressed to the sound conscience of the chancellor, acting upon all the circumstances of each particular

case, we think the order of the Court below should be affirmed.

Considering the bill as a taxpayer's bill to restrain the unauthorized acts of the defendants we fail to see, under the circumstances of the case and under the well settled principles applicable to such suits, how the bill can be sustained. It is true that the law is firmly settled, as was said in *Baltimore* v. *Gill,* 31 Md. 375, that "in this State the Courts have always maintained with jealous vigilance the restraints and limitations imposed by law upon the exercise of power by municipal and other corporations; and have not hesitated to exercise their rightful jurisdiction for the purpose of restraining them within the limits of their lawful authority, and of protecting the citizen from the consequence of their unauthorized acts," and that taxpayers "may invoke the restraining powers of a Court of Equity, and that Court will entertain jurisdiction of their suit against municipal corporations and their officers whenever the latter are shown to be acting *ultra vires,* or are assuming or exercising a power over the property of the citizen, or over corporate property or funds, which the law does not confer upon them, and where such unauthorized acts may affect injuriously the rights and property of the parties complaining"; *St. Mary's Industrial School* v. *Brown,* 45 Md. 310.

These principles have been announced in many cases in this Court and elsewhere, and they establish the proposition that an injunction to restrain the *ultra vires* or illegal acts of municipal corporations or official officers will not be granted unless it appears that the taxpayer would be injured by the acts complained of. The facts disclosed by the record do not bring the plaintiffs' case within this principle. It is difficult to say how they could possibly be injured by the expenditure of public money for the protection and conservation of public property. Unless the building had been removed it would have been destroyed by the National Government, and the act complained of was in fact to the benefit of the taxpayers of the City.

We have no doubt that under Ordinance No. 60, approved July 21, 1860, and confirmed by sub-section 16 of the City Charter (1915 Edition), and under section 91 of that charter, that the charge and control of this Park is vested in the Board of Park Commissioners. The Charter imposes no obligation upon the Board of Estimates with respect to the public parks of the City, nor does it confer any power upon it to interfere with the control and management of such parks committed by law to the Board of Park Commissioners. The assertion of such power by the Board of Estimates must be held to be wholly unauthorized. But when the Court below came to deal with the case it was informed by the evidence that the building had been moved upon the park property and propped upon blocks, and presented an unsightly appearance. In this situation the Court permitted its removal to the foundations prepared for it, and it is now probably located upon those foundations. Certainly no real injury was done to any one. The building, under the City Charter, is now in the charge and control of the Board of Park Commissioners, and it will have ample opportunity to avail itself of all lawful means and remedies to protect its rights in respect to the building against any further invasions.

*Order affirmed, the costs to be paid by the appellants.*