## ANNE ARUNDEL COUNTY, MARYLAND v. GOVERNOR, STATE OF MARYLAND ET AL.

[No. 1592, September Term, 1979.]

*Per Curiam Order February 15, 1980.*

*Opinion Filed April 16, 1980.*

## PER CURIAM ORDER

This cause having come on for argument before this Court, it is this 15th day of February, 1980, by the Court of Special Appeals of Maryland,

ORDERED, that the order of the Circuit Court for Anne Arundel County of January 29, 1980, as supplemented and clarified by the order of February 14, 1980, which in turn clarified the order of February 8, 1980, be and the same is hereby affirmed. The opinion in this cause shall be filed at a later date. Costs to be paid by the appellant. Mandate to issue forthwith.

The cause was argued before GILBERT, C. J., and MORTON and MELVIN, JJ.

*Thomas G. Redman, Assistant County Solicitor for Anne Arundel County,* for appellant.

*Thomas A. Deming, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Richard W. Emory, Jr., Assistant Attorney General,* on the brief, for appellees Governor, State of Maryland et al. *Thomas M. Downs,* with whom were *Blumenthal, May, Downs & Merrill, P.A.* on the brief, for appellee Browning-Ferris, Inc.

GILBERT, C. J., delivered the opinion of the Court.

The distance from Sharptown in Wicomico County,[1] to Curtis Bay, Anne Arundel County, is approximately 80 miles. Nevertheless, the State of Maryland[2] needed almost three months to complete the journey. The reason for the delay enroute was the paper barricade hastily pieced together by Anne Arundel County.[3] As it turned out, the

---

**1.** Sharptown is located at the intersections of Maryland Routes 313 and 348. It is on the south shore of the Nanticoke River.

**2.** The actual parties defendant, appellees, here were: Harry R. Hughes, Governor of Maryland; James B. Coulter, Secretary, Department of Natural Resources, State of Maryland; Thomas C. Andrews, Director, Water Resources Administration, Department of Natural Resources, State of Maryland; J. L. Hearn, Program Director, Enforcement Program — Water Resources Administration, Department of Natural Resources, State of Maryland; Browning-Ferris, Inc., a contractor hauler of the P.C.B. who was allowed "to intervene as a party defendant." Governor Hughes and the other State officials were sued in their official capacities. For convenience sake we shall refer to them collectively as "the State."

**3.** On December 21, 1979, the Mayor and City Council of Baltimore, on motion, were allowed to intervene as a party plaintiff. For simplicity's sake we shall refer to both plaintiffs as the "County."

roadblock was easily pierced, yet it caused the State to make a detour through the courts. At first, the Circuit Court for Anne Arundel County enjoined temporarily the County from interfering with the State's transporting of polychlorinated biphenyl (PCB) and storing it at the United States General Services Administration (GSA) facility at Curtis Bay. Dissatisfied at its lack of success in the circuit court, the County appealed to this Court. Once here they requested that we "stay" the temporary injunction issued by Judge Morris Turk of the circuit court and "advance" the matter for hearing in March 1980. The State opposed both of the County's requests, noting that to grant what the County asked would for all practical purposes defeat the State in its efforts to move the PCB from Sharptown to Curtis Bay. We found it unnecessary to "stay" Judge Turk's order, but we did advance the case for argument to Friday, February 15, 1980.

After oral argument, we issued a *per curiam* order in which we affirmed the temporary injunction. In our order we said that we would subsequently explain the reasons for our action.

The County, refusing to concede defeat, sought certiorari to the Court of Appeals. That Court, in an unprecedented night session, February 19, 1980, denied a "stay" and denied certiorari.

Although the transportation and storage of PCB has been accomplished, so that the issue in this particular case has been mooted, we deem it advisable to discuss the point of law involved.

The County, learning that "large amounts of PCB . . . stored . . . at Sharptown" might be moved to "a site owned by the . . . [GSA] known as the Ordnance Depot located adjacent to Curtis Creek in Anne Arundel County" filed a "Bill of Complaint for an Ex Parte, Interlocutory and Permanent Injunction" against the State.[4] The action, brought in the Circuit Court for Anne Arundel County, alleged, *inter alia:*

> "11. That the Ordnance Depot may be the

---

4. *See* note 2, *supra.*

438

depository of many other [Designated Hazardous Substances] DHS.

12. That one integral element which ... [the State] should have considered in reaching a decision as to the storage of PCB at the Ordnance Depot was what other DHS is already at the site, in what amounts, the proximity to the proposed storage area, and the effect of an involvement of PCB with other DHS in the event of a national [*sic*] or man made disaster.

13. That, in fact ... [the State has] not entered into such consideration ... [and does] not have an inventory of what is stored at the site, nor has same been requested.

14. That the Ordnance Depot is situated in a metropolitan community and is surrounded by the dwellings and places of employment of thousands of individuals whose health and safety could be affected by mishandling of or catastrophe associated with the PCB.

15. That the Ordnance Depot is located adjacent to major water and road networks which could be adversely affected by the mishandling of or catastrophe associated with the PCB.

16. That ... [the County's] Fire Department, through arrangement with the GSA has the primary responsibility for fire suppression on the site and must have specific information regarding the precise location, type, amount, toxicity and other technical details of all DHS at the site in order to responsibly and effectively suppress any conflagration.

17. That ... [County agencies] would be involved on an initial response basis were there to be a natural or man made disaster at the site, these being the Health Department, Police Department, Office of Emergency Preparedness, and various divisions of the Public Works Department.

18. That the transportation of large amounts of PCB over long distances through populated areas from one area of storage to another site for storage purposes creates an unnecessary risk to the health and safety of the general public and a threat to the environment.

19. That ... [the State] should not grant any transportation or storage approvals for a new site until complete compliance has been demonstrated with CFR Part 761.42,[5] to wit:

a. The proposed site does *not* have adequate roof and walls to prevent the seepage of rain water;

b. The proposed site does *not* have an adequate floor surrounded by continuous curbing;

c. The proposed site, particularly the doors and other access portals thereto are *not* constructed so as to prevent liquids from seeping out;

d. The proposed site does *not* have an impervious floor;

e. The proposed site is *not* significantly distant from a 100 year flood plain in its relationship to Curtis Creek.

f. The proposed site does *not* have facilities for safe decontamination of the equipment used to handle PCB.

g. *No* arrangements have been made to provide inspection of the site at least every 30 days;[6] and

h. Other summary irregularities.

20. That no immediate health or safety reason compels the movement of the PCB before a careful

---

5. The proper citation is 40 CFR § 761.42.

6. 40 CFR § 761.42 (b) (5) requires that "[a]ll PCB Articles and PCB Containers in storage shall be checked for leaks at least once every 30 days."

study is completed and all safety regulations duly complied with.

21. That a precipitous decision to move the PCB does present a clear present and immediate threat to the health, safety and welfare of many citizens of the State of Maryland in general, and Anne Arundel County in particular, and to the environment.

22. That ... [the County] has received no formal request to participate in a decision making process which is so vital to the citizens of Anne Arundel County and the consequence of which would be ... [the County's] to bear.

23. That ... [the County] has requested data from the GSA regarding the Ordnance Depot and is employing a responsible consultant to study every aspect of the impact of the storage of PCB at this site.

24. That no harm or prejudice will be sustained if ... [the State delays its] approval of the transportation and storage of the PCB until such time as the study is completed.

25. That ... [the State] should require the GSA to compile and publish an environmental impact statement dealing with the effect of the present storage of DHS at the said Ordnance Depot and as to any proposed future storage there.

26. That immediate, substantial and irreparable injury will result if approval to transport and store PCB at the said site is given before adequate study is conducted as set forth above." (Emphasis in original.)

Judge Williams, on November 13, 1979, granted the sought *ex parte* injunction and required the State to respond within ten days. The parties entered into a stipulation "whereby it was agreed that the ... [County] need not continue to seek ex parte relief pending the hearing on the interlocutory injunction and that ... [the State] would notify

... [the County] when ... applications were submitted ... to ... transfer ... the PCB." [7] The State demurred to the County's suit, but because of subsequent events, the demurrer was withdrawn in open court.

In this Court the facts were conceded to be those found by Judge Morris Turk in the Circuit Court for Anne Arundel County. We now quote extensively, with minor editing, from the Memorandum Opinion of Judge Turk: [8]

> "In the interim, the Anne Arundel County Council passed two ordinances relating to the storage and transfer of hazardous substances within the County. Bill Number 158-79 amends Anne Arundel County Code § 11-401, 11-409 (i) and to add § 11-408 (g). Its stated purpose is:
>
> '... to further define the terms hazardous, TOXIC and special wastes; to establish certain license and permit fees and bond requirements; to provide that the application for the approval of the depositing of hazardous, TOXIC and special wastes shall be on a prescribed form; to require a manifest to accompany certain shipments; to prohibit the landfilling in Anne Arundel County of certain wastes not generated in the County; TO PERMIT REQUESTS FOR INJUNCTIVE RELIEF OR OTHER APPROPRIATE REMEDIES FOR SUBTITLE VIOLATION; to prohibit the transportation on the roads of Anne Arundel County, OR IN THE COASTAL ZONES AS DEFINED IN THE COASTAL ZONE COMMISSION OF ANNE ARUNDEL COUNTY REPORT, of such wastes not generated in the County, and generally relating to the regulation of transporting and disposal of dangerous substances in Anne Arundel County.' [(Emphasis in original.)]

7. Quoted from Memorandum of January 29, 1980.

8. The parties, in this Court, agreed that Judge Turk's recitation of facts was complete and accurate.

Bill Number 159-79 amended the County Code to add § 11-408 (h) and (i). The Council's express intent was:

'... to add certain definitions relating to hazardous, TOXIC and special wastes; to permit the movement in Anne Arundel County of certain hazardous, TOXIC and special wastes under certain conditions; to establish certain licenses for the transporting of certain substances; providing that the subtitle does not apply to certain substances; establishing certain license and permit fees; providing that the ordinance is contingent on the passage of another; and generally relating to the regulation of certain dangerous substances in Anne Arundel County.' [(Emphasis in original.)]

As a result of the passage of these local ordinances by Anne Arundel County, the ... [State] filed a counter-claim for Declaratory Injunction and Interlocutory and Permanent Relief alleging that State and Federal regulation[s] of hazardous substances have preempted the field of hazardous waste control from local regulation; that the area is beyond the County's legislative authority; and that the ordinances violate the commerce clause of the Federal Constitution. ...

A hearing on both interlocutory injunctions was held ... on January 11, 1980. On that date, after consultation with all parties ..., Browning-Ferris, Inc., a certified hauler of hazardous substances, was granted leave to intervene as a party-Defendant. ...

....

The ... [State's] case was supported by the testimony of several individuals who represented various Federal and State agencies in developing the plan for the movement of the PCB's from Sharptown and their storage at Curtis Bay.

Mr. Philip Retallick, an environmental scientist with the United States Environmental Protection Agency (EPA) testified concerning the chemical characteristics and hazards of PCB's. . . .

Mr. Retallick described the workings of the Federal Water Pollution Control Act § 311, which provides for expenditure of federal funds whenever one of the 'Regional Response Teams' authorized by that Act determines that a navigable waterway is being threatened by the discharge or potential discharge of hazardous substances. The EPA became involved following notification by the Coast Guard that a Sharptown facility operated by the GRICO Company for the purpose of recovering and reclaiming waste oil was storing hazardous substances in an unsafe fashion.

An on-site investigation revealed that several tanks, some located approximately 25 yards from the Nanticoke River, contained petro-chemicals, waste oil and PCB's and other hazardous substances. Testing was done at EPA, Coast Guard and DNR Laboratories. The testing report indicated that Tank No. 16, which is located closest to the River, contains PCB's in the level of 310,000 parts per million (ppm). Tank No. 17 contains traces of xylene, a chemical with a flash point of 80 degrees Fahrenheit. Tank No. 18 contains xylene mixed with PCB in the level of 6,700 ppm. (See Defendants' Exhibit A).

Mr. Retallick testified that materials containing PCB's in excess of 50 ppm are considered to be a toxic substance. As to the effect of PCB's, Mr. Retallick stated that PCB causes liver cancer in test animals, such as mice and rats. When humans come into contact with PCB's, they are susceptible to a skin reaction much like acne, dizziness, jaundice, loss of appetite, sterility and nausea. Also, PCB's are not biodegradable and remain in the environment for approximately the same length of

time as the insecticide DDT. The soil can absorb PCB's. In waterways, PCB's sink to the bottom and rest in the sediment where it can be consumed by fish and other acquatic [sic] species. If these fish are in turn eaten by others along the food chain, the PCB's are passed along, resting in the fatty tissue of the recipient.

Mr. Retallick further testified that liquids containing PCB's between 50 and 500 ppm can be boiled in an EPA approved boiler and that such a facility did exist in Maryland. Liquids containing PCB's in excess of 500 ppm must be burned in EPA approved incinerators. At present, there are incinerators in Arkansas and Texas that have successfully completed the testing stage and are awaiting final approval. Assuming no public opposition to those plants, they will be operational by April 1, 1980. In Sharptown tanks, 7960 gallons of PCB materials may be destroyed in boilers and 24,510 gallons must be burned in incinerators.

Testing by the Coast Guard and the National Oceanic Atmospheric Administration (NOAA) revealed no abnormal levels of PCB's in the Nanticoke River adjacent to the GRICO site, at the time of said test.

Mr. Retallick personally inspected the Sharptown facility in connection with his duties with EPA as a member of the regional response team. As such, he is charged with the enforcement of the Federal Toxic Substances Control Act and 40 CFR § 761.42, which sets forth the Federal requirements for the storage of PCB's. He found that the present Sharptown facility is deficient in that the tanks lack an impervious base of finished concrete or steel; there are no adequate roof and walls, the tanks are below the 100 year flood plain, there is no proper levee system to protect the River nearby.

. . . .

The Team felt that leaving the material in the tanks at Sharptown constitutes a serious hazard. The tanks, resting on sandy soil, would have to be raised to construct an impervious base. The danger of rupture in such a procedure was felt to be too great.

The Court attempted to obtain from Mr. Retallick a general statement as to the approximate period of time from the transfer from Sharptown to final disposal in the incinerators. He stated that removal from the tanks to Curtis Bay would take approximately two weeks and that, assuming an April 1, 1980 starting date for the incinerators, all of the material could be out of Curtis Bay by April 14, 1980.

The Mayor of Sharptown, Mr. Ralph Cordrey, testified on behalf of the ... [State]. He described the location of the GRICO facility as surrounded by Sharptown on three sides, the fourth side being the Nanticoke River. Mr. Cordrey stated that because of the seriousness of the situation, an evacuation plan was developed by the local fire department with the help of civil defense officials in Salisbury, in the event of an emergency. The plan includes, among other things, a three block evacuation. Finally, the Mayor testified concerning the importance of the Nanticoke River as a rich source of local food and income and its value as a prime spawning area for Chesapeake Bay rockfish.

Mr. James L. Hearn, Director of the Department of Natural Resources Water Resources Administration, a named Defendant, testified concerning the State's role in the present controversy. Tests of materials taken by DNR during the August visit to Sharptown along with EPA and the Coast Guard resulted in findings identical to those reported by Mr. Retallick.

Based on the preliminary results of these tests, the Response Team, of which Mr. Hearn was a

member, surveyed 1,000 potential sites for interim storage, consisting mainly of State and Federal government facilities. Criteria for selection included availability, expense, present use, modification required, access, security, proximity to population centers and number of persons working in the area. Only one potential private site located in Jessup, Georgia, was considered, but that facility did not meet Federal standards and is now under investigation by EPA. Haulers of hazardous substances contacted by the Team were unable to suggest any additional private locations.

... [A] Memorandum to Mr. Hearn from the Maryland Environmental Service,[9] listed the five final candidate sites for interim storage. These included a vacant turkey house at the Maryland Correctional Institute in Washington County, the Dundalk Marine Terminal, the Edgewood Area of the Aberdeen Proving Ground, an abandoned Nike Site in Tolchester and the Curtis Bay Ordnance Depot.

Mr. Hearn stated that the Curtis Bay Depot was given a 'priority one' rating due to its immediate availability, security, location one-half mile from the nearest population center, the fact that only 30-40 persons are employed there and the minor nature of the modifications required. ... In addition, Mr. Hearn described the Curtis Bay warehouse as 1/4 to 1/2 mile to the nearest water and 19 feet above the 100 year flood plain.

[The witness testified as to why other sites were rejected.] ... [T]he suggestion of keeping the material in drums on trucks at the GRICO location was rejected because all of Sharptown is below the 100 year flood plain.

Mr. Hearn was cross-examined at length about the events leading up to the selection of Curtis Bay.

---

9. The Memorandum was an exhibit introduced into evidence by the State.

The DNR issued an administrative order against Mr. Grigsby, the owner of the GRICO facility and the Small Business Administration (SBA) as trustee of the Company, ordering them to remove the PCB's from Sharptown. . . . Mr. Hearn also described an unsuccessful attempt to have General Electric Inc. accept the PCB's so the Company can store the chemical along with their own at its Philadelphia location.

. . . Captain John Kime of the Coast Guard, Captain of the Port of Baltimore, Marine Safety Officer, . . . testified concerning his duties under § 311 of the Federal Water Pollution Control Act. By agreement between EPA and the Coast Guard, the latter agency assumes control over water pollution emergencies occurring in the coastal areas of the United States.

In his capacity as the pre-designated on-scene coordinator of the Regional Response Team, Captain Kime received a telephone call this past July, from the SBA. After having assumed control of the GRICO facility as Trustee under a loan agreement, the SBA conducted a sale of the property. After the sale, Mr. Grigsby of GRICO informed the SBA that hazardous materials were stored along with the waste oils at Sharptown. The Buyer refused to complete his purchase.

. . . [T]he Coast Guard declared the situation at Sharptown to be a Federal project under § 311 to secure funding. In July, the Sharptown facility was secured, the fence repaired, valves checked, handles removed and spouts plugged. SBA was ordered to take action but by order of Judge Miller of the United States District Court in Case No. M-78-702, Mr. Grigsby was declared to be the owner of the chemicals at Sharptown. After being ordered to remove the wastes, Mr. Grigsby refused.

Captain Kime confirmed the testimony of Mr. Retallick and Mr. Hearn, stating that samples were

taken in July, August and September, 1979. After the Response Team formally invoked § 311, Captain Kime suggested that an interim storage site be selected pending final approval of proper incinerators. He indicated that the Response Team, in considering ... five candidate sites, voted unanimously in favor of only one, Curtis Bay. However, the Team's vote was advisory only and the final selection of the GSA Depot was Captain Kime's. The Captain testified that after the initial selection, he initiated a meeting with Anne Arundel County officials, including members of the County delegation at which a 'second look' was requested. Captain Kime agreed to reconsider but confirmed the selection of Curtis Bay as the interim storage site.

Factors considered by Captain Kime included ease of modification to EPA standards; security considerations; impact on present use, present storage of other 'national emergency materials', remoteness from populated areas and unauthorized traffic, and location above the 100 year flood plain.

Next, he described the Curtis Bay facility and its comparison with the EPA criteria for proper storage of PCB's as outlined above. The floor is made of concrete, over which an additional four inches of concrete was poured. Berms 12 inches high and 20 inches thick have been constructed. In addition, an impervious epoxy coating has been applied to the floor. Access to the warehouse is via four heavy metal doors. Surrounding the warehouse is a concrete apron upon which the transfer of the PCB would occur.

The Coast Guard has made arrangements with the owners of the Texas incinerator, Rollins Environmental Services, to transfer the material from Sharptown to Curtis Bay and from there to any of the three incinerators as soon as any one of them are approved, the same being Rollins incinerator in

Texas, the Endsco facility in Arkansas and a Dutch incinerator ship owned by Insco.

Captain Kime's estimate of the time-table for final disposal differed from Mr. Retallick's inasmuch as the Coast Guard was more involved with the details of the negotiations with Rollins. As of the hearing, no final contract had been signed, but the Coast Guard was prepared to accept the changes made by Rollins to the initial proposal. These included no more than 30 days worth of PCB's to be stored in Texas, which is 100,000 gallons and a provision giving Rollins 60 to 90 days from final approval for removal. Therefore, assuming no public opposition to an April 1, 1980 opening date for the Texas facility, July 1, 1980, would mark the end of a 90 day term. On cross-examination a 'realistic' final completion date was calculated to fall between July 1st and Labor Day. Nonetheless, the Curtis Bay agreement with GSA . . . gives December 31, 1980, as the expiration date.

The planned procedure for the transfer of the PCB's [from Sharptown to Curtis Bay] was outlined by Captain Kime. Within thirty days from final agreement, the Contractor would come on scene at Sharptown accompanied by a Coast Guard mobile command, laboratory facilities and air quality testing equipment. Materials containing PCB's with less than 50 ppm (non-hazardous) would be transferred to tank trucks and sent to New Jersey and Arkansas. The materials containing hazardous levels of PCB's would be pumped into 55 gallon drums approved by the DOT according to 49 CFR § 178.82 and filled at 90 per cent capacity. The lids would be screw tops, threaded and countersunk. These drums would be loaded onto closed tractor trailers at 80 drums per truck. The trucks would transfer the materials at the rate of two loads per day totaling an estimated ten to fifteen truck loads. Movement would occur during daylight, non-rush

hours, in good weather, with a State Police escort. The trucks would leave Sharptown on Route 313, onto Route 50, then North on Route 2 to Ordnance Road to the Curtis Bay Depot, all State highways.

The trucks would be unloaded on the concrete apron surrounding the warehouse inside a dike system prepared to contain 100 per cent of the material being transferred. Protective clothing and clean-up materials would be available on-site. A forklift truck, meeting Underwriters Laboratory standards for movement of explosives would be used. The drums would be placed on wood or steel pallets, four to a pallet and stacked two pallets high. An emergency generator for lighting would be available during the transfer. At no time would the drums rest on bare soil.

... Anne Arundel County officials were not consulted until after the initial selection of Curtis Bay.

It was ... revealed that there is no electricity in the warehouse and that future on-site inspections would be made using portable and natural lighting. A spill prevention control and counter measures plan under 40 CFR § 112 (b) would be developed and approved by EPA prior to movement.

A dispute between State and Federal officials over the necessity of a State permit for the Curtis Bay facility was revealed. ... [T]he Coast Guard ... [provided] all materials required for [such] a permit [from the State] but explicitly ... [denied] the necessity for one. A State certification for transporting the materials must be obtained by the hauler.

. . . .

Mr. Hearn of the Water Resources Administration ... testified that based upon the materials provided by the Coast Guard, the State was prepared to issue an emergency permit for the

Curtis Bay facility despite the lack of a formal application. If no removal has occurred at the end of 180 days, a new decision would be made by the State. As far as the transportation certification, Mr. Hearn has had no contact with the proposed hauler, Rollins, other than providing a copy of the applicable regulations. Hauler certification can be provided within two days of application to the Hazardous Waste Permit Division.

. . . [The County offered the testimony of] the County Executive, Mr. Robert A. Pascal. Mr. Pascal described the County's relationship with the Curtis Bay facility in that the County Office of Emergency Preparedness, Police and Fire officials consider the Depot to be within their jurisdiction and responsibility. . . . [He] expressed his concern over the lack of any County input into the selection of Anne Arundel County as the storage site for hazardous materials, the potential impact of any spills on the County population, vandalism and the proximity of the Baltimore-Washington International Airport glide path and other oil storage tanks in Curtis Bay.

Mr. Donald T. Perry, Chief of the County Water Division, testified concerning the location of the Anne Arundel County water supply. . . . Mr. Perry . . . [said] that the distance from the GSA warehouse to the County wells was two and a half miles.

Mr. Perry's expert qualifications did not extend to the chemical properties of PCB's and organic chemicals in general and their movement through soils in contaminating water supplies. On cross-examination, Mr. Perry testified . . . that based on Captain Kime's testimony, he had no reason to believe that the PCB's would come into contact with the ground below the warehouse.

Mr. Singh Dillon, Director of Environmental Health in the County, testified concerning his duties in enforcing State and County Health

ordinances. . . . He . . . [explained] his . . . understanding of his duties under the new County Ordinances, 158-79 and 159-79. Mr. Dillon stated that they applied to storage and transportation of hazardous wastes such as PCB's, applied substantially the same criteria for approval as used by DNR and EPA and were designed to force involvement of County officials in the area of local hazardous waste disposal.

The final witness was a research and development chemist with the Minaret Corporation, Mr. Fred Cashen. His area of expertise concerns the effect of hazardous chemicals such as PCB on life forms.

Mr. Cashen's testimony was intended to raise concerns regarding the storage of materials containing PCB's and xylene in the manner outlined by the . . . [State]. Xylene's low flash point was cause for concern on his part. This was exacerbated by the fact that xylene vapors collect near the floor while the GSA ventilators are near the ceiling. These chemical properties, plus the planned storage on wooden pallets gave rise to his conclusion that the storage plan presented an extreme fire hazard. Mr. Cashen's conclusions concerning proper storage of xylene was based on the recommendations of the National Fire Prevention Association Manual. He has never inspected the Curtis Bay warehouse."

The County sought a dichotomous injunction: 1) to enjoin the State from invoking its statutory [10] and regulatory powers [11] as a means of issuing a permit to the Coast Guard [12] to operate a hazardous waste (PCB) facility at the

---

10. Maryland Natural Resources Code Ann. (1974, 1979 Cum. Supp.) § 8-1413.2 (Safe disposal of designated hazardous substances).

11. COMAR 08.05.05.08 (Applications for a Facility Permit) and 08.05.05.09 (Temporary — Emergency Permits).

12. The Coast Guard, while seeking the permit, denied that it actually needed one from the State.

GSA site in Curtis Bay; 2) to enjoin the State from issuing a permit to a hauler authorizing transportation of the PCB.[13]

The State, by way of counterclaim, requested that the court 1) "issue an interlocutory injunction enjoining . . . [the County] from enforcing the provisions of Bill Nos. 158-79 and 159-79" and 2) after hearing the counterclaim on its merits, issue a declaratory judgment that the same provisions "are unauthorized and invalid under the Federal Constitution, the State Constitution and the laws of the State of Maryland. . . ."

1.

Based on the evidence presented, Judge Turk ruled that the County had not met its "burden of showing clear and definite facts demonstrating a danger of irreparable injury or that the public interest . . . [would be] best served by the storage of the PCB materials at Sharptown, even for a short term." The judge found that the County simply was unable to show that the storage of the PCB at Curtis Bay posed an imminent threat to the populace.

The State was more successful than its political subdivision. The evidence produced by the State satisfied the trial judge as to the safety of the Curtis Bay facility. At the same time the State demonstrated that to allow the PCB to remain in Sharptown posed an imminent threat to that area.

Judge Turk then made four specific findings of fact:

1. An emergency existed at Sharptown with respect to the PCB storage.
2. The tank in which the PCB was stored did not meet the required standards.
3. Both the Federal and State Governments made

---

**13.** Md. Natural Resources Code Ann. (1974, 1979 Cum. Supp.) § 8.1413.2(l) provides: "Except for designated hazardous substances used for residential purposes or those regulated by the [Maryland State] Department of Agriculture, a person may not transport a designated hazardous substance to a facility within the State unless the person first obtains a certificate from the Department [of Natural Resources] and the transporting vehicle is certified by the Department [of Natural Resources]."

> a systematic selection of the Curtis Bay facility as the proper place to store PCB pending removal to incinerators.
>
> 4. That there is far less danger to the public if the storage of the PCB occurs at Curtis Bay than there is by continuing storage at Sharptown.

The court held that the State established a likelihood of success when the case was tried on its merits, and that, were he to grant the County's request, it would be the equivalent of standing idly by "in the face of a precipitously dangerous situation" that could result in permanent, serious, and irreparable damage to the people of the State. Judge Turk, as we noted earlier, granted the State's request and enjoined the County from enforcing its newly enacted ordinances.

2.

The matter of the transportation permit was disposed of summarily because the County was unable to show "any facts which would support . . . [that] extreme action." Hence, the requested relief was denied.

The County noted its appeal to this Court.

The County and the State conceded at oral argument that the *sole* issue before this Court is whether Judge Turk abused his discretion in rejecting the issuance of the temporary injunction sought by the County, and in granting the State's requested interlocutory injunction against the enforcement of the County's ordinances 158-79 and 159-79.

All that Judge Turk was called upon to decide, and all that he did decide, was that the State, at the hearing before him, "demonstrated a likelihood of success [when the case is heard] on the merits [and that there existed] an immediate danger of irreparable harm and a threat to the public interest" if the temporary injunction against the County's enforcement of the ordinance was not issued.

We, therefore, confine our discussion to the limited issue before us, leaving to another day the interesting underlying questions of federal and State preemption in the area of

environmental control as well as the County's authority, if any, to regulate State actions.

The Court of Appeals, speaking through Judge Digges in *State Department of Health and Mental Hygiene v. Baltimore County,* 281 Md. 548, 550, 383 A.2d 51, 53 (1977), noted that "it is a rare instance in which a trial court's discretionary decision to grant or to deny a preliminary injunction will be disturbed . . . [on appeal]."

Judge Digges went on to explicate that:

"While there is '[n]o principle . . . better established, than that the granting or refusing of a writ of injunction, is a matter resting in the sound discretion of the court,' *Shoemaker v. Mechanics Bank,* 31 Md. 396, 398 (1869); *see Kahl v. Con. Gas, El. Lt. & Power Co.,* 189 Md. 655, 658, 57 A.2d 331, 332-33 (1948), it is also true that this discretion must be exercised by the chancellor upon a consideration of all the circumstances of the case. *McKeever v. Realty Corp.,* 183 Md. 216, 225, 37 A.2d 305, 310 (1944); *Williams v. M. & C.C. of Balto.,* 128 Md. 140, 157-58, 97 A. 140, 145 (1916); E. Miller, *Equity Procedure* § 574, at 682 (1897). It is frequently said that *a proper exercise of discretion requires the court to consider four factors: likelihood of success on the merits; the 'balance of convenience'; irreparable injury, which can include the necessity to maintain the status quo; and, where appropriate, the public interest. See, e.g., Wieck v. Sterenbuch,* 350 A.2d 384, 387 & n. 3 (D.C. 1976) (citation of authorities). And it is the complainant who has the burden of presenting a case justifying the granting of a preliminary injunction, *Baltimore v. Warren Manuf. Co.,* 59 Md. 96, 105 (1882), so that if the facts as stated in the bill of complaint or, when appropriate, as shown by the evidence, are not 'full and sufficiently definite and clear, in support of the right asserted, and that such right has been violated,' the court will not order preliminary

relief." (Emphasis supplied.) 281 Md. at 554, 383 A.2d at 55.

Where, as here, two levels of government, *i.e.,* State and County, are acting in what they believe to be the public interest, and those beliefs result in an irreconcilable conflict in the carrying out of their respective governmental duties,

> "a court of equity can best resolve the impasse by issuing a temporary injunction ... *to preserve the status quo until a decision on the merits is rendered, so long as that course does not result in greater harm to the public interest than would a refusal to interfere.* Thus in *Pr. George's Co. v. Md-Nat'l Cap.,* 269 Md. 202, 306 A.2d 223, *cert. denied,* 414 U.S. 1068 (1973), we indicated that declaratory relief was appropriate where public agencies are at loggerheads, *id.* at 209-10 [228], and further concluded that '[t]he controversy was so "ripe" for declaratory relief that the chancellor ... properly issued the temporary injunction to prevent, *pendente lite,* grave injury to the Commission's park and planning functions and recreational activities ... by [proposed actions of] the County Executive' " (Footnote omitted.) (Emphasis supplied.) 281 Md. at 556, 383 A.2d at 56.

Applying the four factors of *State Department of Health and Mental Hygiene, supra,* to the instant case, we conclude, as did Judge Turk, that the State's likelihood of success upon the trial on the merits is substantial. When we add to that conclusion the possibility of the irremediable damage that could have resulted to the people of Maryland if the PCB had not been removed immediately from the Sharptown storage tanks to a place of relative safety, it becomes crystalline that Judge Turk properly exercised his discretion when he refused to restrain the State from moving the PCB and, instead, enjoined the County from enforcing the ordinances which would have frustrated the State's action.