493 A.2d 1100

**SECI, INC.**

**v.**

**CHAFITZ, INC., et al.**

**No. 1520, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

June 14, 1985.

L. Marc Zell, Bethesda, (Jerry R. Goldstein and Topf, Zell, Kolodny & Goldstein, Bethesda, on brief), for appellant.

Herbert D. Morrison, Frederick, for appellees.

Argued before WILNER, BLOOM and KARWACKI, JJ.

WILNER, Judge.

Following extensive negotiations and two preliminary agreements, appellant SECI, Inc. (SECI), on May 10, 1983, entered into an agreement with Chafitz, Inc. and its two stockholders, Steven and Arleen Chafitz, to purchase the business assets of Chafitz, Inc.

The agreement was a comprehensive one. It provided for the sale and the amount and method of payment of the purchase price; it also contained a number of representations on the part of Chafitz, Inc. and its two stockholders regarding the company and its financial condition. Section 4 acknowledged the importance to SECI of Steven Chafitz's continued association with the business and obligated SECI, upon closing, to enter into a separate consulting agreement with him "substantially in the form annexed hereto as Schedule J and made a part hereof."

Unfortunately, the purchase agreement, as included in the record extract, contained neither a Schedule J nor any separate consulting agreement. Section 4 of the purchase agreement did set out, however, what would appear to be the basic terms of a consulting agreement, providing for its duration (five years with an apparent, but undeclared, ability to extend the term for an additional two years), and compensation ($198,000 base fee, payable in 18 quarterly installments of $11,000 plus an incentive fee computed on SECI's annual gross sales).[1] Section 4H provided, in relevant part:

"Notwithstanding anything in this Section 4. to the contrary, Purchaser shall have the right to terminate the Consultant Agreement or the two-year extension period, without liability to Consultant, in the sole event either Seller Steven Chafitz or Arleen Chafitz materially breaches their respective obligations under the restrictive cove-

---

**1.** We were advised at oral argument that there was indeed a separate agreement that was executed and that it essentially embodied the terms set forth in Section 4 of the purchase agreement.

nants set forth in Section 5 hereof.[2] In the event of such termination, Purchaser shall have no liability for either the Base Consultant's Fee or Incentive Fee after the date of termination. No termination under this Paragraph shall be effective unless made in writing, by Purchaser, fully setting forth the reasons for such termination and supported by opinion of counsel for Purchaser. Further, before such termination shall become effective, Purchaser shall submit the matter to arbitration and shall pay the amounts otherwise due Consultant into escrow pursuant to the provisions of Section 7.C."

In Section 7, Chafitz, Inc. and its stockholders indemnified SECI against cost and damage resulting from "any misrepresentation" on the part of Chafitz, Inc. Section 7C provided, in relevant part:

"(i) In the event of any breach, misrepresentation or nonfulfillment of any covenant on the part of Seller or the Chafitz Stockholders under this Agreement, Purchaser may deduct the amount of such claim or liability as a set-off against any amounts due Steven Chafitz under the Consultant's Agreement as set forth in Section 4 hereof; *provided, however, that in the event Purchaser elects to make any such deduction or set-off Purchaser shall pay the full amount due to Steven Chafitz to L. Marc Zell and Fred Goldman ('Escrow Agents'), who shall hold the disputed sum in escrow pending the results of the arbitration as set forth below.*

(ii) *All disputes over any sums withheld by Purchaser as a set-off as provided in Section 7.C(i) hereof, shall be settled by arbitration* in Washington, D.C. before a single arbitrator in accordance with the then prevailing Rules of Commercial Arbitration of the American Arbitration Association. Such arbitration shall be selected by mutual agreement of counsel for Seller and Purchaser, respectively. Any award rendered by the arbitrator shall

---

**2.** Section 5 precluded Chafitz, Inc. and its stockholders from engaging in competitive activities for a period of five years.

be final and binding upon the parties and judgment may be entered thereon in any Court having jurisdiction over the party against whom enforcement is sought." (Emphasis added.)

Finally Section 28, captioned "Arbitration and Escrow," provided:

"In the event of a dispute as to the meaning of any term in this Agreement or the interpretation of any matter in this Agreement, the parties agree to arbitration in accordance with the provisions of Section 7.C. During the pendency of any such dispute, any amounts otherwise due any party hereunder shall be paid into escrow also in accordance with the terms of Section 7.C. Notwithstanding the above, nothing in this Section shall preclude any party hereto from seeking injunctive relief in a court of competent jurisdiction to restrain any breach of this Agreement."

Closing under the May 10 agreement, we are told, occurred on May 26, 1983. On January 20, 1984, SECI filed a four-count complaint in the Circuit Court for Montgomery County charging Chafitz, Inc. and its stockholders with breach of contract, fraud, negligent misrepresentation, and conspiracy, all of which proceeded from the underlying allegation that the defendants "misrepresented the assets and liabilities of Chafitz, Inc."

The defendants responded a month later with a general denial of liability and their own charge that SECI had failed to pay the consulting fee required under Section 4 of the purchase agreement. This counterattack took the form of (1) a counterclaim in the original action charging SECI with breach of contract and (along with certain individuals) civil conspiracy and (2) a separate action against SECI and the individuals, also for breach of contract and conspiracy. Nothing was said in these actions about arbitration or the duty to pay the consulting fee into escrow; the only remedy sought was money damages—$500,000 compensatory damages and, for the conspiracy, $1,000,000 in punitive dam-

ages. On motion of Chafitz, Inc. and its stockholders, the two actions were consolidated.

In June, 1984, Chafitz and its stockholders filed a petition for mandatory injunction. Calling attention to the language of Section 7C(i) of the purchase agreement quoted and underscored above, they asked that the court order SECI "to pay into the escrow account all sums which [SECI] disputes are due to the Defendants." The purpose of the contractual provision, they averred, was to protect the defendants if SECI was unsuccessful in disputing the payment of the fees and "to provide a secure fund for the Defendants in the event the Plaintiff should not be solvent at the end of this litigation."

After a hearing, the court, on August 21, 1984, issued the requested injunction, directing SECI immediately to pay into escrow "all payments due on the consulting agreement referred to in [the purchase agreement]." Specifically, the order required SECI to pay at once the sum of $33,000 due on February 1, May 1, and August 1, 1984, as well as $11,000

> "on the first day of November, February, May and August for the remainder of 1984 and each succeeding year until the dispute between the parties is settled or determined by a Court of competent jurisdiction, by arbitration or otherwise, or until the full amount of the consulting agreement has been paid into escrow pursuant to the terms of the Agreement of May 10, 1983."

No bond was required of Chafitz or its stockholders as a condition of the injunction. Following the noting of this appeal, the court stayed the injunction upon SECI's posting a bond of $44,000 (the November, 1984 installment having come due), the bond to increase periodically as each future installment comes due. Feeling aggrieved, SECI complains in this appeal that:

> "I. The Lower Court Exceeded its Authority and Abused its Discretion in Granting a Mandatory In-

terlocutory Injunction for the Sole Purpose of Direct-
ing SECI to Pay Money into Escrow.
 A. Chafitz Has Not Demonstrated Irreparable Inju-
ry.
 B. Chafitz Has an adequate Remedy at Law.
 II. The Lower Court Erred in Granting an Interlocu-
tory Injunction Without Requiring Chafitz to File a
Bond.
 III. Chafitz Has Waived Any Contractual Right to Place
Disputed Consulting Fees into an Escrow Account."

We think that SECI's first complaint has merit—that the
court erred in granting the injunction under the circum-
stances of this case. It is therefore unnecessary for us to
consider Issues II and III.

 We begin by observing that, as a general rule, the
granting or denying of an injunction *in an appropriate
case* is a discretionary matter, and the exercise of that
discretion will not be disturbed on appeal absent a showing
that the discretion has been abused. *Tyler v. Secretary of
State*, 230 Md. 18, 20, 185 A.2d 385 (1962). Moreover,
although the law was once to the contrary, it is clear now
that an injunction need not be denied merely because the
party seeking it has an adequate remedy at law. *See*
Md.Rule BB76; *Anne Arundel Co. v. Whitehall Ven.*, 39
Md.App. 197, 200 (n. 2), 384 A.2d 780 (1978).

 Notwithstanding these general principles, it has long
been the law that, ordinarily, injunctive relief should not be
granted to enforce or enhance a monetary claim of a
general creditor prior to the entry of judgment on his claim.
In the early case of *Uhl v. Dillon*, 10 Md. 500 (1857), for
example, a general, unsecured creditor, claiming that the
defendant debtor was disposing of his property and secret-
ing his assets in preparation to abscond, sought and re-
ceived the appointment of a receiver and an injunction
directing that the debtor's assets be applied to the claims of
the complainant and other creditors. The Court of Appeals
reversed, concluding, at 503:

"The appellees, (the complainants below,) are merely general creditors of the appellant, who have not prosecuted their claim to judgment and execution, nor in any other manner acquired a lien upon the debtor's property, and were not entitled to the writ of injunction nor to the appointment of a receiver."

That maxim has remained more or less fixed in Maryland law since *Uhl v. Dillon*. *See Frederick Co. Bank v. Shafer*, 87 Md. 54, 39 A. 320 (1898), and cases cited therein; *Perlmutter v. Minskoff*, 196 Md. 99, 111, 75 A.2d 129 (1950); and *cf. Frigidraft, Inc. v. Michel*, 198 Md. 509, 84 A.2d 695 (1951), dealing with the appointment of a receiver. The rule is a necessary complement to the more basic system we have of establishing the priorities among general creditors in the property of a debtor in terms of the entry and recording of judgments.

■ Although appellees' request for injunctive relief certainly encompassed some aspects of a *Uhl v. Dillon* situation—an attempt to create "a secure fund for [Steven Chafitz] in the event [SECI] should not be solvent at the end of this litigation"—it differed from *Uhl* in the sense that it was, in reality, seeking specific performance of an express contractual undertaking and not merely the securing of an otherwise general unsecured claim. Injunctive relief may be granted for that purpose, as the functional equivalent of specific performance. *See Smith v. Myers*, 130 Md. 64, 99 A. 938 (1917); *Hearn v. Ruark*, 148 Md. 354, 129 A. 366 (1925); *Lissau v. Smith*, 215 Md. 538, 138 A.2d 381 (1958). However, as stated in *Smith v. Myers*, 130 Md. at 67, 99 A. 938, "[a] suit for an injunction which seeks to accomplish all the purposes of a decree for specific performance is subject to the principles which apply to an application for the latter remedy . . . .

■ One of the principles applicable in specific performance cases is that a contract or covenant subject to conditions will not be specifically enforced unless and until the

conditions have been either satisfied or waived. *Griffith v. Scheungrab,* 219 Md. 27, 34–35, 146 A.2d 864 (1958); *Connolley v. Harrison,* 23 Md.App. 485, 327 A.2d 787 (1974). The court, in other words, must deal with the precise contract made by the parties, and not some judicial enlargement of it.

■ Through their petition for injunctive relief, the Chafitzes sought specific performance of one aspect of Section 7C of the purchase agreement. But the one provision cannot be taken out of context. Section 7C(i) authorizes SECI to set off claims based on nonperformance or misrepresentation on the part of Chafitz, Inc. against the consulting fee due to Steven Chafitz. There is a condition to that privilege, however; if SECI makes such a deduction, it must place the amount with the designated escrow agents "who shall hold the disputed sum in escrow *pending the results of arbitration as set forth below.*" (Emphasis added.) There follows then the clear, unequivocal statement that "[a]ll disputes over any sums withheld by Purchaser as a set-off as provided in Section 7.C.(i) hereof, shall be settled by arbitration ...," which is consistent with the more general arbitration clause in Section 28 and the analogous provision of Section 4H, quoted above.

We think it clear, then, that the escrow arrangement envisioned and was contingent upon the underlying dispute being submitted to and resolved by arbitration. Indeed, the escrow agents were authorized to hold the escrow funds only "pending the results of arbitration."

We do not view that as a casual or unimportant condition. The underlying transaction was a complex one—the purchase agreement, excluding the 10 appendices, was 63 pages—and it was certainly to be expected that resolution of disputes arising from it through normal litigation would be (and has been) a time-consuming affair. If, indeed, Steven Chafitz was the principal in the company and the

ultimate author of the various representations made by Chafitz, Inc., SECI would naturally desire to set off any claims based upon those representations against sums due him under the consulting agreement. That, of course, would put him in the position of plaintiff, having to bring the suit, prove his case, and obtain judgment in order to collect; to the extent of the periodic fees, SECI would recoup its losses periodically and automatically.

The escrow arrangement altered that situation. The advantage of time and the onus of being plaintiff shifted; SECI's recoupment would be neither quick nor automatic, but would have to wait until the underlying dispute was resolved. Given that circumstance, it would not be at all unreasonable for SECI to agree to such an arrangement only if the underlying dispute were resolved expeditiously, by arbitration. That, clearly, is what the agreement required.

For whatever reason, both sides elected to forgo the mandated arbitration. SECI sued at law and simply set off its claim without regard to the escrow provision. The Chafitzes, it would seem, could have easily redressed that situation by demanding arbitration under both Section 7C and Section 28. That would have brought the escrow provision into full play and, under the last sentence of Section 28, authorized the very type of injunction issued by the circuit court. But they too forsook their right to arbitration and agreed to resolve the dispute by litigation. In so doing, however, they also forsook their right to the escrow; absent an arbitration proceeding, the escrow agents had no authority to hold the funds.

In granting the injunction, then, the court specifically enforced a provision that had become inapplicable; therein lay its error.

INJUNCTION VACATED; APPELLEES TO PAY THE COSTS.