761 A.2d 899

Richard C. COLANDREA

v.

WILDE LAKE COMMUNITY ASSOCIATION, INC., et al.

No. 24, Sept. Term, 2000.

Court of Appeals of Maryland.

Nov. 8, 2000.

374

James G. Kress (Brian D. Wallach of Howrey, Simon, Arnold & White, LLP, on brief), Washington, DC, for appellant.

David H. Bamberger (Edward S. Scheideman of Piper, Marbury, Rudnick & Wolfe, LLP, on brief), Washington, DC, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

CATHELL, Judge.

Richard C. Colandrea, appellant, appealed from a decision of the Circuit Court for Howard County in favor of the Wilde Lake Community Association, Inc. (hereafter referred to as Association). Appellant alleges that the trial court erred in its ruling on the applicability of one of the Association covenants, and on its ruling that the enforcement of that covenant by the Association's Architectural Committee (hereafter referred to as Committee) was appropriate. We granted certiorari on our own motion prior to consideration by the Court of Special Appeals.[1] Colandrea presents three issues, as follows:

I. Whether the Circuit Court erred in rejecting Colandrea's Fair Housing Act counterclaim where it was demonstrated at trial that: (1) the Village steadfastly refused to make any reasonable accommodation for the group home; (2) the Village's enforcement of the restrictive covenant evinced certain Architectural Committee members' discriminatory intent and retaliation against Colandrea for providing housing to the disabled; and (3) the Village's selective enforcement of the restrictive covenant has a disparate impact on the disabled.

II. Whether the Circuit Court erred in granting a permanent injunction which will result in the permanent closure of housing for the disabled without requiring the Village to demonstrate the four prerequisites for such relief.

III. Whether the Circuit Court erred in holding that the Architectural Committee's decision to close the senior-as-

---

1. We initially note that had appellant's brief contained a complete history of the litigation in respect to his efforts to maintain such facilities in the Village of Wilde Lake, we may not have granted certiorari in this case. We were led by appellant's brief to surmise that appellant's concerns in respect to the Fair Housing Act and the rights of the disabled had not previously been addressed. As we shall point out, that is not precisely the case.

sisted facility was reasonable, made in good faith, and was not whimsical, capricious or high-handed, where the decision was not supported by any competent evidence and in any event was a mere pretext for improper motives harbored by at least some of the Committee members.

We answer each issue in the negative. The trial court neither erred nor abused its discretion. We shall affirm.

## Facts

The Village of Wilde Lake is one of the unincorporated, planned, largely residential communities encompassed under the larger unincorporated, planned community of Columbia in Howard County. The various communities, including The Village of Wilde Lake are managed, *i.e.*, governed, by community associations. These associations utilize covenants in the nature of contractual obligations that run with the land, in order to regulate the uses of the properties under their purview.[2] The parties do not contest the existence of the restriction at issue, or that it is a covenant running with the land. The covenant at issue provides:

Section 11.02. *No profession or home industry* shall be conducted in or on any part of a Lot or in any improvement thereon on the Property without the specific written approval of the Architectural Committee. The Architectural Committee, in its discretion, upon consideration of the circumstances in each case, and particularly the effect on surrounding property, may permit a Lot or any improvement thereon to be used in whole or in part for the conduct of a profession or home industry. No such profession or home industry shall be permitted, however, unless it is considered, by the Architectural Committee, to be compatible with a high quality residential neighborhood. The following ac-

2. The properties are, of course, also subject to local and state government land use restrictions, such as zoning, environmental regulations, etc. Generally, when property is subject to both zoning and other governmental regulations, and conditions created by real property covenants, that property must satisfy the most restrictive of the regulations or conditions.

tivities, without limitation, may be permitted by the Architectural Committee in its discretion: music, art and dancing classes; day nurseries and schools; medical and dental offices; fraternal or social club meeting place; seamstress services.

Colandrea owns two abutting properties, with existing dwellings, located at 10433 and 10461 Waterfowl Terrace in the Village of Wilde Lake. The Committee approved 10461 Waterfowl Terrace, but not 10433 Waterfowl Terrace, when considering Colandrea's applications to use the properties as senior-assisted living facilities.[3] The decision of the Committee was, in relevant part, as follows:

With respect to 10461 Waterfowl Terrace [Log No. 4432(b)], the Committee has approved the application, but only upon the following conditions, as previously explained at the February 27, 1996 meeting:

. . . .

With respect to 10433 Waterfowl Terrace [Log No. 4432(a)], the Committee disapproved the application at the February 27, 1996 meeting. Based upon the Committee's review and consideration of all the documents submitted in regard to the application, as well as the testimony at the Architectural Committee meetings on February 13 and February 27, 1996, it is the Committee's judgement that the incremental increase in the amount of traffic, congestion, noise, trash and waste, as well as parking problems attributable to an additional facility at that location, have had and would continue to have a detrimental impact on the residential character of the neighborhood, particularly in view of

---

**3.** In a previous case in the circuit court involving the same properties, No. 93–CA–21562, the circuit court in 1995 found that under the covenant, the senior-assisted living facilities required Committee approval. Because appellant had not previously sought that approval, the trial court remanded the case in order to give appellant an opportunity to apply. Had approval been granted for both properties, the present issue, at least as presented in this case, would not have arisen. When, however, the Committee failed to approve of the use of 10433 Waterfowl Terrace, the present litigation commenced.

the unique configuration of the street and the surrounding properties. [Alterations in original.]

After the decision of the Committee, appellant continued to operate and expressed his intention to continue to operate, a senior-assisted living facility at 10433 Waterfowl Terrace in spite of the Committee's disapproval of his application. In response, the Association instituted the present proceedings in the circuit court seeking injunctive relief, asking the court to enjoin the operation of the business at 10433 Waterfowl Terrace. That court, after discussing the evidence presented to it, granted injunctive relief. It discussed the evidence, in part, as follows and then granted an injunction:

Michael Deets [a member and Chair of the Architectural Committee] ... stated that numerous concerns were expressed by residents at the February 13 meeting, including issues pertaining to excessive trash, noise, traffic flow problems, parking problems, and concerns about whether Mr. Colandrea or his mother actually resided on the property.[4]

. . .

Mr. Deets testified that similar concerns were advanced at the February 27 meeting. One resident spoke about the possibility of medical waste and the lack of information concerning the storage of such waste; while another commented upon the issue of adult diapers and potential sewer problems. The Committee voted to approve the application for 10461 ... and voted disapproval of the application for 10433....

. . . .

The Plaintiff [the Association] produced as a witness, James Meale, a member of the Architectural Committee.... He described the February 13 meeting as follows:

"There were a number of residents there.... There was some emotion certainly. I would say in general I found it to be reasoned. There were the general com-

---

4. This was important, we presume, because appellant was seeking approval of a "home" industry or business.

plaints against trash, traffic, congestion, lights shining at people's homes from the property. That the general feeling was that this was a residential neighborhood and that two (2) homes were disruptive to that neighborhood. The general comments, as I recall them, were that one (1) home would be alright, two (2) homes were too many." Mr. Meale described the February 27 meeting, as follows:

"There were more people at that meeting, maybe twenty-five (25). There was more discussion, much of it along the same lines. I believe it was at this second meeting that the issue of medical waste and whether there was medical waste being discarded at the homes, was brought up. I remember there were several medical people there, who basically led that discussion. There was the same discussion of traffic congestion, emergency vehicles, feeling of lack of maintenance of the property during snow storms was brought up. The ambulance had to pull in across the street at one point."

Mr. Meale stated that he believed observations of his neighbors was "accurate." He found their information credible. He stated that he voted for approval of the 10461 application and against the 10433 application. He explained his vote as follows:

"I am . . . have been involved with working with elderly my whole career. . . . I came in really believing that I would vote for two applications. I came to believe listening to a testimony and also looking at the history of the application process, the fact that Mr. Colandrea did not want to even apply for an in-home business and then when he was ordered to do so, delayed it. . . . I came to the conclusion that two (2) houses really did overtax the neighborhood. That in my view this was one (1) business with two (2) locations. It's advertised that way, it's still advertised that way and that the house at 10461, the one I supported, has a long driveway, which if properly used, could handle a good deal of the traffic or the visitors and the staff. That the house on the corner [10433 Waterfowl Terrace], the one I voted against, seemed to me to be on

the corner of a moderately busy street, in a particularly congested area and that the obstructions on the street and to the neighbors and to the community were serious at that point and there wasn't much way to correct them because the driveway was small, one car length, relatively narrow and that two (2) houses were overtaxing the infrastructure of the area of this particular neighborhood."

This Court finds the testimony of Mr. Meale regarding the Committee's reasons for denying the application of 10433 particularly persuasive. This Court finds that the decision of the Architectural Committee to disapprove the facility at 10433 was based upon concerns by the residents relating to trash, noise, parking, traffic, sewage and health. These concerns were heightened by a realization that Colandrea had been insensitive to his neighbors in the past and a further realization that it was unlikely that he would attempt to minimize any negative impact that would result in the future from a business operation being conducted in a residential neighborhood. In sum, the decision of the Committee was a reasonable, good faith exercise of discretion, based upon legitimate concerns regarding the impact of the facility upon the surrounding neighborhood.

### INJUNCTIVE RELIEF

... An injunction will lie to enforce a restrictive covenant with respect to the use of the land conveyed, provided proper ground therefor exists.... Furthermore, the restrictive covenants provide for enforcement by means of injunctive relief....

The Defendant [Colandrea] contends that the Plaintiffs [Association] are not entitled to injunctive relief because the Plaintiff is unable to satisfy four criteria: (1) success on the merits, (2) the injury suffered if the injunction is granted is less than the harm that would result from its refusal; (3) irreparable injury, and (4) public interest. *Maryland Commission on Human Relations v. Downey [Communications]*, 110 Md.App. 493[, 678 A.2d 55 (1996)]; *NCAA v.*

*Johns Hopkins University,* 301 Md. 574[, 483 A.2d 1272 (1984)]. Defendant's emphasis on these two cases is misplaced. They set forth a four pronged test for the issuance of an interlocutory injunction as distinguished from relief by means of a permanent injunction.

This Court finds that injunctive relief is necessary in the instant case in order to maintain the integrity of a restrictive covenant, which was enforced by the Plaintiffs in a reasonable and fair manner. [Some citations omitted.]

The trial court then addressed the remaining counts of Colandrea's counterclaim. In respect to Colandrea's Fair Housing Act claims, the trial court noted that: "Judge Sybert ruled [in case No. 93–CA–21562 (see n. 3 *supra*)] that the FHA did not relieve Colandrea from complying with the requirements of the covenants.... Thus, [Colandrea's] claim under the FHA, is restricted, as a matter of law, to events that occurred after he submitted an application for approval to the Committee."

As to appellant's fair housing argument before this Court, he contends that "(2) the [Association's] enforcement of the restrictive covenant evinced certain Committee members' discriminatory intent and retaliation against Colandrea for providing housing to the disabled." The trial judge in the present litigation addressed those concerns in his written memorandum finding that there was no "targeting." In respect to the events occurring since the 1995 case, the trial court, addressing the FHA allegations, stated:

There is no evidence to establish that the Plaintiffs "targeted" senior assisted living facilities in general, or Colandrea's facilities in particular, nor does the evidence suggest that the Plaintiffs have excluded such facilities from their community. To the contrary, the Plaintiffs approved Colandrea's application at 10461 and three additional facilities. Three out of four such applications submitted by persons other than Colandrea were approved. [Colandrea's] contention that the Plaintiffs have imposed arbitrary spacing requirements is simply not supported by the evidence. In

fact, correspondence between the Committee and others indicate a contrary intent. (Plaintiff's exhibits 22, 23 and 24).

In a FHA claim based upon an alleged failure to make a reasonable accommodation, [Colandrea] bears the burden of proving that the requested accommodation is (1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing. *Bryant Woods Inn, Inc. v. Howard County,* 124 F.3d 597 (4th Cir.1997).... [5]

... Phyllis Madachy, Administrator of Howard County Office of Aging, testified that there are presently sixty-three senior assisted housing facilities in Howard County, thirty-two of which are located in Columbia.... The current vacancy rate is approximately twenty-five percent. This Court finds that the approval of a facility at 10433 Waterfowl Terrace is not necessary to afford disabled persons equal opportunities in housing, in ... light of the presence of a facility operated by Colandrea nearby, and the existence of adequate assisted living facilities located in Columbia and Howard County.

All of the trial court's findings discussed, *supra,* are supported by evidence in the record. It is clear that the trial court also addressed appellant's FHA claims relating to the applicability of the covenant and its application in the instant case, and determined that the Act's provisions had not been violated by the Association's conduct following the circuit court's decision in the 1995 litigation. We agree.

The trial court then addressed Colandrea's claim that the denial of approval for 10433 Waterfowl Terrace violated the public policy of the State. The court discussed, at some length, the testimony of Gene Heisler, Assistant Director of

---

**5.** This case, initiated by Colandrea via his corporation, Bryant Woods Inn, Inc., challenged on Federal Housing Act grounds Howard County's refusal to approve zoning for one of the subject properties of the instant case so as to accommodate an assisted living facility for up to fifteen residents. Colandrea's claims were rejected by the United States District Court for Maryland and the United States Court of Appeals (4th Cir.).

Licensing and Certification Administration, of the Department of Health and Mental Hygiene. Mr. Heisler, testifying on behalf of appellant, stated that it was the State's policy to promote affordable and accessible housing for the elderly and to encourage "aging in place," described as being able to stay in the home they have chosen as their health deteriorates. He also testified as to the public policy of the State, saying in relevant part:

> Q. Could you describe ... the policies of the State of Maryland, with respect to assisted living homes for elderly persons with disabilities?
>
> A. Well, the policies ... envisions a system of regulation where individuals are given their choice of where that they want to live. Also, the policies are to promote the affordable and accessible housing for the elderly. Also, to encourage the concept of aging in place.... Their [sic] some of the policies that we advocate.
>
> ....
>
> A. My opinion is, that the relief sought by the association is contrary to the policies of the State, in that prospective residents would be denied a choice of going into that home, so in affect, you would diminish the choices that people have for assisted living facilities.

On re-cross-examination, Mr. Heisler testified:

> Q. But, it's not the public policy of the State of Maryland, that some specific address on a specific street should be an assisted living facility or not or how big it should be, is it?
>
> A. No, that's not the idea. The idea is that people have choices as to where they want to live.

The court initially noted that this issue had already been resolved against Colandrea in the 1995 litigation when Judge Sybert had found the covenant at issue to be "facially neutral."

Moreover, the trial court, in the instant case, noting the large number of senior assisted-living facilities in the area and the high vacancy rate for such units, independently found that "the Plaintiffs' conduct as it relates to the Colandrea applica-

tion was reasonable and did not violate public policy of the State of Maryland." Additionally, in its fashioning of injunctive relief, the trial court created a remedy that fully comported with the State's "aging in place" preferences, one of the State's "public policy" concerns.

The trial court concluded by finding that there had been no interference with appellant's contractual relationships; that there had been no evidence presented showing any adverse impact upon Colandrea's "contractual relations or how he was damaged as a result." The court then enjoined appellant from "admitting any new residents or filling any vacancies, as they may occur, at the senior assisted-living facility ... at 10433 Waterfowl Terrace...."

## RESOLUTION

We shall address, as necessary, the issues resolved by the trial court. We shall note the standard of review applicable in this case, then discuss the legal nature of restrictive covenants in general, and the one at issue in particular. First, we address appellant's FHA issues.

### I. Fair Housing Act

In prior Case No. 93–CA–21562, *The Columbia Association, Inc. v. Richard C. Colandrea (Colandrea I)*, the Circuit Court for Howard County rendered a finding against the appellant in the case at bar. In relevant part, that trial court stated in 1995:

The Plaintiffs' Complaint seeks an injunction ordering the Defendant to cease and desist operation of the Senior Assisted Housing facilities at 10461 and 10433 Waterfowl Terrace [the identical properties at issue in the case *sub judice*]....

Mr. Colandrea operates the Bryant Woods Inn, Inc. out of two residences in the Village of Wilde Lake.... The Plaintiffs argue that the operation of these facilities violates express terms of the restrictive covenants governing the properties, and contend that the activities therefore require

prior approval from the Wilde Lake Architectural Review Committee.

... Moreover, the Defendant has filed a Counter Claim which alleges that the actions of the Plaintiff violate the provisions of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

. . . .

Having ruled that the Defendant's activities are subject to regulation under the covenants, the Court shall next consider the Defendant's Counter Claim alleging violations of the Fair Housing Act.... Nevertheless, the Court is of the opinion that the Wilde Lake covenant at issue is facially neutral. The covenant is applicable to the conduct of *any* business activity, industry, or profession, not merely group homes.... That goal is, on its face, non-discriminatory, and it seems as though the Architectural Review Committee approval process is a legitimate way of addressing that concern.

Colandrea appealed that decision to the Court of Special Appeals. Before that court heard the appeal, Colandrea dismissed it. Accordingly, the prior decision that the covenant was neutral on its face, and that on its face it was non-discriminatory and that the Committee's approval process is a legitimate way of addressing the issue of discrimination under the FHA, was a final decision on the merits on those issues there presented and as to the FHA issues resolvable at that time. Accordingly, to the extent we address FHA related issues, if we do, it is limited to the Association's actions occurring after the final judgment in the prior case.

Additionally, Colandrea, while *Colandrea I* was pending, filed a Complaint with the United States Department of Housing and Urban Development (HUD) against the same appellees in the present case, and others, asserting violations of the Fair Housing Act. HUD investigated the claim and ultimately found that "reasonable cause does not exist to believe that a discriminatory housing practice has occurred. Accordingly, the above-referenced complaint is hereby dismissed."

In *Janes v. State,* 350 Md. 284, 711 A.2d 1319 (1998), we stated that:

Collateral estoppel, or issue preclusion, began life and retains life as a common law doctrine. A common and well-established articulation of the doctrine is that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Murray International v. Graham,* 315 Md. 543, 547, 555 A.2d 502, 504 (1989), quoting from RESTATEMENT (SECOND) OF JUDGMENTS, § 27 (1982). The functions of this doctrine, and the allied doctrine of *res judicata,* are to avoid the expense and vexation of multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibilities of inconsistent decisions. *Graham, supra,* 315 Md. at 547, 555 A.2d at 504, citing *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210, 217 (1979).

*Id.* at 295, 711 A.2d at 1324; *see Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970) ("[Collateral estoppel] means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."); *Gibson v. State,* 328 Md. 687, 693, 616 A.2d 877, 880 (1992) ("The collateral estoppel doctrine operates to a preclusive end, so that when an issue of ultimate fact has been determined once by a valid and final judgment, that issue cannot be litigated again between the same parties in a future action."); *Cousins v. State,* 277 Md. 383, 398, 354 A.2d 825, 834 ("Collateral estoppel prevents the State from litigating a second time an issue of ultimate fact where there has already been a final determination of that issue in the accused's favor."), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 652, 50 L.Ed.2d 631 (1976). In further distinguishing collateral estoppel, we have stated that:

This Court has repeatedly recognized that there is a distinction between the principles of res judicata and collateral

estoppel. *Bankers & Shippers Ins. Co. of New York v. Electro Enterprises, Inc.,* 287 Md. 641, 652, 415 A.2d 278, 284 (1980); *Cook v. State,* 281 Md. 665, 668–69, 381 A.2d 671, 673 (1978); *LeBrun v. Marcey,* 199 Md. 223, 226–27, 86 A.2d 512, 514 (1952). This distinction was recently expressed in *MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A.2d 486, 489 (1977), (quoting *Sterling v. Local 438,* 207 Md. 132, 140–41, 113 A.2d 389, 393, *cert. denied,* 350 U.S. 875, 76 S.Ct. 119[, 100 L.Ed. 773] (1955)):

" ' . . . If the second suit is between the same parties and is upon the *same cause of action,* a judgment in the earlier case on the merits is an absolute bar, not only as to all matters which *were litigated* in the earlier case, but as to *all matters which could have been litigated* [res judicata]. If, in a second suit between the same parties, even though the *cause of action is different,* any determination of fact, which was *actually litigated* in the first case, is conclusive in the second case [collateral estoppel].' " (Citation omitted) (emphasis added).

Thus, if a proceeding between parties involves the same cause of action as a previous proceeding between the same parties, the principle of res judicata applies and all matters actually litigated or that could have been litigated are conclusive in the subsequent proceeding. *Alvey v. Alvey,* 225 Md. 386, 390, 171 A.2d 92, 94 (1961); *Snodgrass v. Stubbs,* 192 Md. 287, 290–91, 64 A.2d 130, 132 (1949); *State v. Brown,* 64 Md. 199, 204, 1 A. 54, 56 (1885). If a proceeding between parties does not involve the same cause of action as a previous proceeding between the same parties, the principle of collateral estoppel applies, and only those facts or issues actually litigated in the previous action are conclusive in the subsequent proceeding. *Bankers & Shippers Ins. Co. of New York,* 287 Md. at 652, 415 A.2d at 284; *MPC, Inc.,* 279 Md. at 33, 367 A.2d at 489; *Prescott v. Coppage,* 266 Md. 562, 570–73, 296 A.2d 150, 154–55 (1972). When the principle of collateral estoppel applies, facts or issues decided in the previous action are conclusive only if identical to facts or issues presented in the subsequent

proceeding. *MPC, Inc.,* 279 Md. at 35, 367 A.2d at 490; *see Washington Suburban Sanitary Comm'n v. TKU Assocs.,* 281 Md. 1, 18–19, 376 A.2d 505, 514 (1977).

*Mackall v. Zayre Corp.,* 293 Md. 221, 227–28, 443 A.2d 98, 101–02 (1982) (alteration in original).

We stated in *FWB Bank v. Richman,* 354 Md. 472, 731 A.2d 916 (1999), that:

The basic rule of claim preclusion in this context is not difficult: "A valid and final personal judgment rendered in favor of the defendant bars another action by the plaintiff on the same Claim." RESTATEMENT (SECOND) OF JUDGMENTS § 19 (1982). As we pointed out in *deLeon v. Slear,* 328 Md. 569, 580, 616 A.2d 380, 385 (1992), the traditional principle of *res judicata* has three elements: "(1) the parties in the present litigation should be the same or in privity with the parties to the earlier case; (2) the second suit must present the same cause of action or claim as the first; and (3) in the first suit, there must have been a valid final judgment on the merits by a court of competent jurisdiction." . . .

When an earlier court has actually ruled on the matter sought to be litigated in a second court, the "same claim" analysis is usually straightforward. . . . It has long been established that a judgment between the same parties or their privies upon the same cause of action is conclusive "not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit." *Alvey v. Alvey,* 225 Md. 386, 390, 171 A.2d 92, 94 (1961); *MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A.2d 486, 488–89 (1977). In dealing with that issue, we have adopted the "transactional" approach set forth in § 24 of the RESTATEMENT (SECOND) OF JUDGMENTS: "When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . . the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *deLeon v. Slear, supra,* 328 Md. 569, 590, 616 A.2d 380, 390;

*Kent County Bd. of Educ. v. Bilbrough, supra,* 309 Md. 487, 498, 525 A.2d 232, 237–38. In deciding whether a factual grouping constitutes a "transaction," the RESTATEMENT directs a pragmatic approach, "giving weight to such considerations as whether the facts are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." RESTATEMENT, *supra,* § 24(2).

*Id.* at 492–93, 731 A.2d at 927–28; *see Gertz v. Anne Arundel County,* 339 Md. 261, 269–70, 661 A.2d 1157, 1161 (1995) ("In *deLeon,* 328 Md. at 580, 616 A.2d at 385, this Court restated the elements of the traditional principle of *res judicata* ").

Judge Wilner, then a member of the Court of Special Appeals, in *Klein v. Whitehead,* 40 Md.App. 1, 12, 389 A.2d 374, 381, *cert. denied,* 283 Md. 734 (1978), described the doctrines known as *res judicata,* collateral estoppel, and collateral attack on judgments, saying: "These three doctrines, though related, are different; they apply in different circumstances and they prevent different things." He defined *res judicata* and collateral estoppel as branches of estoppel by judgment with *res judicata* being a direct estoppel and collateral estoppel "is what its name says it is." *Id.* at 13, 389 A.2d at 381. After discussing the relative differences between the doctrines, that court opined: "For either to apply, the second action must be between the same parties or those in privity with them." *Id.* at 15, 389 A.2d at 383; *see also Murray Int'l Freight Corp. v. Graham,* 315 Md. 543, 552–53, 555 A.2d 502, 506–07 (1989) (Upon assertion by an employer that a freight hauler was not its employee despite a previous Commission finding to the contrary, the Court of Appeals opined that the collateral estoppel doctrine did not apply based partly upon its determination that the party against whom estoppel was asserted could not have appealed from the prior Commission decision.).

Collateral estoppel is concerned with the issue implications of the earlier litigation of a different case, while *res*

*judicata* is concerned with the legal consequences of a judgment entered earlier in the same cause. *Burkett v. State,* 98 Md.App. 459, 465, 633 A.2d 902, 905 (1993), *cert. denied,* 334 Md. 210, 638 A.2d 752 (1994). The two doctrines are based upon the judicial policy that the losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on issues raised, or that should have been raised. *Department of Human Resources v. Thompson,* 103 Md.App. 175, 652 A.2d 1183 (1995).

 "Collateral," for collateral estoppel purposes, denotes that the estopping influence came into the case in issue from some other outside case, and in the context of a single case, issue-preclusive operation should actually be called "direct estoppel." *Burkett v. State,* 98 Md.App. at 466, 633 A.2d at 906. Collateral estoppel is not concerned with the legal consequences of a judgment, but only with the findings of ultimate fact, when they can be discovered, that necessarily lay behind that judgment. *Id.*

 In *Washington Suburban Sanitary Commission v. TKU Associates,* 281 Md. 1, 18–19, 376 A.2d 505, 514 (1977), we approved a four-part test, which must be satisfied in order for the doctrine of collateral estoppel to be applicable:

1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?

2. Was there a final judgment on the merits?

3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

*See also Potomac Design, Inc. v. Eurocal Trading, Inc.,* 839 F.Supp. 364 (D.Md.1993) (when issue of fact or law is actually litigated and determined by a valid final judgment, and that determination is essential to the judgment, the determination is conclusive in a later action between the parties, whether the same or different claim is asserted). Thus, for the doctrine of collateral estoppel to apply, the probable fact-finding that

undergirds the judgment used to estop must be scrutinized to determine if the issues raised in that proceeding were actually litigated, or facts necessary to resolve the pertinent issues were adjudicated in that action. *See Burkett,* 98 Md.App. at 466, 633 A.2d at 906.

Under Maryland Law, the requirements of *res judicata* or claim preclusion are: 1) that the parties in the present litigation are the same or in privity with the parties to the earlier dispute; 2) that the claim presented in the current action is identical to the one determined in the prior adjudication; and 3) that there was a final judgment on the merits. *Blades v. Woods,* 338 Md. 475, 478–79, 659 A.2d 872, 873 (1995); *Cicala v. Disability Review Bd.,* 288 Md. 254, 263, 418 A.2d 205, 211 (1980); *Cook v. State,* 281 Md. 665, 668, 381 A.2d 671, 673, *cert. denied,* 439 U.S. 839, 99 S.Ct. 126, 58 L.Ed.2d 136 (1978); *Douglas v. First Sec. Fed. Sav. Bank, Inc.,* 101 Md.App. 170, 181, 643 A.2d 920, 926, *cert. denied,* 336 Md. 558, 649 A.2d 601 (1994); *Major v. First Va. Bank,* 97 Md.App. 520, 533–34, 631 A.2d 127, 133 (1993). Therefore, a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action and is conclusive, not only as to all matters decided in the original suit, *but also as to matters that could have been litigated in the original suit. Lockett v. West,* 914 F.Supp. 1229 (D.Md.1995); *Potomac Design, Inc. v. Eurocal Trading, Inc.,* 839 F.Supp. 364 (D.Md. 1993); *Burkett,* 98 Md.App. 459, 633 A.2d 902 (1993), *cert. denied,* 334 Md. 210, 638 A.2d 752 (1994). *To avoid the vagaries of res judicata's preclusive effect, a party must assert all the legal theories he wishes to in his initial action, because failure to do so does not deprive the ensuing judgment of its effect as res judicata. Lockett,* 914 F.Supp. at 1233. As can be seen, *res judicata* looks to the final judgment on the merits earlier entered in the same case *or same cause* and to the necessary legal consequences of that judgment. *Burkett,* 98 Md.App. at 464, 633 A.2d at 905.

In the present cause, the parties are the same parties included in the 1995 circuit court case and in the HUD

proceeding.[6] Moreover, appellant could have prosecuted his prior appeal to conclusion but declined to do so. The applicability of the Fair Housing Act, and the question of whether the covenant at issue, its procedural requirements, or its effects, violated the Fair Housing Act, has been previously finally litigated. As to the specific issue, issue preclusion controls. The issue was presented in appellant's counter-claim in the prior case. To the extent that appellant may argue that not every nuance was presented to the court in the prior case, every nuance should have been presented under appellant's then Fair Housing Act counter-claim. The judgment in the prior case has collateral estoppel effects on all issues there raised, or that should have been raised.

While, upon our review of the lower court's decision in the case at bar we perceive no error in its findings, we, because of the preclusive and *res judicata* effect of the prior proceedings concerning virtually identical matters and the same cause of action, shall not address further appellant's facial attack on the covenants that constitute his primary Fair Housing Act claim. Moreover, we agree with the trial court's disposition of Colandrea's Fair Housing Act arguments as to the Association's conduct occurring subsequent to the 1995 judgment.

## II. Permanent Injunction

We shall note the standard of review applicable in this case, then discuss the legal nature of restrictive covenants in general, and the one at issue in particular.

### a. Standard of Review

 As we stated in *Urban Site Venture II Limited Partnership v. Levering Associates Limited Partnership*, 340 Md. 223, 229–30, 665 A.2d 1062, 1065 (1995):

---

6. The HUD proceeding does not, in and of itself, foreclose a claimant from seeking further relief in federal or state courts. We include the mention of it in our opinion to stress the fact that appellant has had multiple opportunities to litigate the issue of his rights under the Fair Housing Act vis-a-vis the covenant in question, and has not prevailed.

Both this Court and the Court of Special Appeals, when reviewing a case tried without a jury, must "review the case on both the law and the evidence." Maryland Rule 8–131(c) (1995 Repl.Vol.). The Court must "not set aside the judgment of the trial court on the evidence unless clearly erroneous," and must "give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* In addition, we must consider the evidence in the light most favorable to the prevailing party, *e.g., Geo. Bert. Cropper, Inc. v. Wisterco,* 284 Md. 601, 620, 399 A.2d 585[, 595] (1979), and decide not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence. *E.g., State Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 305, 236 A.2d 282[, 289] (1967).

 The trial court ordinarily has the discretion to grant or deny a request for injunctive relief in general equity matters of the type here involved and that decision is reviewed by this Court under the "abuse of discretion" standard. *State Dep't of Health & Mental Hygiene v. Baltimore County,* 281 Md. 548, 554, 383 A.2d 51, 55 (1977); *Maryland Commission on Human Relations v. Downey Communications, Inc.,* 110 Md.App. 493, 521, 678 A.2d 55, 69 (1996); *Teferi v. Dupont Plaza Assocs.,* 77 Md.App. 566, 578, 551 A.2d 477, 483 (1989); *Nationwide Mut. Ins. Co. v. Hart,* 73 Md.App. 406, 410–11, 534 A.2d 999, 1001 (1988); *Holiday Universal Club, Inc. v. Montgomery County,* 67 Md.App. 568, 576, 508 A.2d 991, 995, *cert. denied,* 307 Md. 260, 513 A.2d 314 (1986), *appeal dismissed,* 479 U.S. 1049, 107 S.Ct. 920, 93 L.Ed.2d 973 (1987); *Seci, Inc. v. Chafitz, Inc.,* 63 Md.App. 719, 725, 493 A.2d 1100, 1103 (1985); *Anne Arundel County v. Governor,* 45 Md.App. 435, 455, 413 A.2d 281, 290–91 (1980). An injunction is "a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience." *Downey Communications,* 110 Md.App. at 515, 678 A.2d at 66. Injunctive relief is relief "prohibiting someone from doing some specified act or commanding some-

one to undo some wrong or injury ... [g]enerally, it is a preventive and protective remedy, *aimed at future acts,* and it is not intended to redress past wrongs." *Carroll County Ethics Comm'n v. Lennon,* 119 Md.App. 49, 58, 703 A.2d 1338, 1342–43 (1998). (Alteration in original.)

■ In *Downey Communications,* the Court of Special Appeals, citing our case of *National Collegiate Athletic Association v. Johns Hopkins University,* 301 Md. 574, 580, 483 A.2d 1272, 1275 (1984), stated:

> A permanent injunction is, as its name indicates, "an injunction final or permanent in its nature granted after a determination of the merits of the action." Md. Rule BB70d. But a permanent injunction is not "permanent" in the sense that it must invariably last indefinitely. Rather, it "is one granted by the judgment which finally disposes of the injunction suit." The difference between an interlocutory injunction and a permanent injunction turns on "whether there has been a determination on the merits of the claim. If that determination has been made, then the injunction may be final; if not, it is interlocutory." [Citation omitted.]

*Downey Communications,* 110 Md.App. at 517, 678 A.2d at 67. In the case at bar, a decision has been made on the merits. The injunction ordered by the trial court was, therefore, a permanent injunction. The requirements for the imposition of an interlocutory injunction do not apply.[7]

■ Generally, covenants affecting property are, even when running with the land, nonetheless contractual in nature.

---

7. Accordingly, the essential requirements necessary for the issuance of an interlocutory injunction are not relevant. The requirements for the issuance of a permanent injunction to enforce contract, i.e., rights under covenants, are based primarily on contract law except as modified by our cases. One of the elements that may be considered is the doctrine of comparative hardship. An innocent mistake on the part of the party in breach of the covenant can be considered in that analysis. *See Urban Site,* 340 Md. 223, 665 A.2d 1062, *Chevy Chase Village v. Jaggers,* 261 Md. 309, 320, 275 A.2d 167, 173 (1971). No issue of innocent mistake exists in the case *sub judice.*

A suit to enforce them is in the nature of specific performance. We have stated that "[w]here specific performance is proper, equity may accomplish the same result permanently or temporarily by the use of injunction." *Lissau v. Smith*, 215 Md. 538, 548, 138 A.2d 381, 387 (1958) (citing *Smith v. Meyers*, 130 Md. 64, 99 A. 938 (1917)).

Maryland courts have held that injunctive relief is entirely appropriate for violations of private covenants. *Kirkley v. Seipelt*, 212 Md. 127, 128 A.2d 430 (1957); *Mikolasko v. Schovee*, 124 Md.App. 66, 88, 720 A.2d 1214, 1224 (1998), *aff'd*, 356 Md. 93, 737 A.2d 578 (1999); *Souza v. Columbia Park and Recreation Association, Inc.*, 70 Md.App. 655, 657, 522 A.2d 1376, 1377–78, *cert. denied*, 310 Md. 130, 527 A.2d 51 (1987). However, as we have said, "refusal [to approve] would have to be a reasonable determination made in good faith, and not high-handed, whimsical or captious in manner." *Kirkley*, 212 Md. at 133, 128 A.2d at 434.

We have held that the doctrine of comparative hardship is available when considering injunctive relief in actions involving private covenants. *Beane v. McMullen*, 265 Md. 585, 617, 291 A.2d 37, 53 (1972); *Dundalk Holding Co. v. Easter*, 215 Md. 549, 137 A.2d 667, *cert. denied*, 358 U.S. 821, 79 S.Ct. 34, 3 L.Ed.2d 62, *reh. denied*, 358 U.S. 901, 79 S.Ct. 219, 3 L.Ed.2d 151 (1958). We described the doctrine of comparative hardship in *Chevy Chase Village v. Jaggers*, 261 Md. 309, 275 A.2d 167 (1971), in which we stated:

> The final argument the doctor makes is that if he must return to his former home or remove his office to comply with the covenants, he will suffer great hardship and inconvenience when he has only caused negligible harm to his neighbors. He invokes the equitable doctrine of comparative hardship to avoid this result. That doctrine has been explained with forceful clarity by Chief Judge Hammond for the Court in *Dundalk Holding Co. v. Easter*, 215 Md. 549, 555–57, 137 A.2d 667, [670–71,] *cert. denied*, 358 U.S. 821, [79 S.Ct. 34, 3 L.Ed.2d 62,] rehearing denied, 358 U.S. 901[, 79 S.Ct. 219, 3 L.Ed.2d 151] (1958), which was recently reaffirmed in *Grant v. Katson*, 261 Md. 112, 274 A.2d 88

(1971). It [the doctrine of comparative hardship] basically provides that a court may decline to issue an injunction where the hardship and inconvenience which would result from the injunction is greatly disproportionate to the harm to be remedied. Innocent mistake on the part of the party to be enjoined is a factor to be considered in applying the doctrine. Overlooking the fact that the doctor, though a mediate purchaser whose deed only made reference to the restrictive covenants in his predecessor's deed, should have been aware of the limits on the use of his property, we do not think he can invoke the doctrine by characterizing the potential harm that might result to his neighbors' homes as comparatively negligible. Their interest in preserving the residential integrity of their community is simply not outweighed by his desire to move to another fashionable and exclusively residential area. With the facts before us in this case, had the trial judge declined to issue the injunction because of comparative hardship, we would not have hesitated to overrule him for a clear abuse of discretion. As he only went so far as to find that there had been a change in the neighborhood capable of vitiating the restrictive covenants, we base our reversal on this fact. On remand we direct that the appellees be enjoined from using their property in Chevy Chase Village for the practice of medicine unless they actually reside on the premises.

*Id.* at 320–21, 275 A.2d at 173.

In *Grubb v. Guilford Association, Inc.*, 228 Md. 135, 178 A.2d 886 (1962), suit was brought by Guilford Association, Inc., against Mr. Grubb, an actively practicing doctor, to enforce a restrictive covenant that would prevent him from using his residence as his regular and main office. Mr. Grubb contended that the doctrine of comparative hardship applied. This Court stated:

We think Dr. Grubb's actual knowledge of the covenant before he bought, his unwarranted assumptions as to the intent of the Association, his failure either to obtain a written waiver of the restriction or to require the Association officials to spell out in detail how far they proposed to

unbend, and the substantial interest of the Association in maintaining its property rights protected by the covenant, leave no room for the application of the doctrine of comparative hardship, which the appellant urges should be applied to protect him. *Cf. Easter v. Dundalk Holding Co.,* 199 Md. 303, 305, [86 A.2d 404, 405 (1952)] and *Dundalk Holding Co. v. Easter,* 215 Md. 549, 555–556, [137 A.2d 667, 670–71 (1958)].

*Id.* at 140, 178 A.2d at 888.

In *Liu v. Dunnigan,* 25 Md.App. 178, 333 A.2d 338 (1975), suit was brought to enforce a restrictive covenant, which would enjoin the appellant from using a part of his residence as a doctor's office. Appellant appealed from a decree granting an injunction that enforced the restrictive covenant and raised the doctrine of comparative hardship. He contended that the injunction should not have been granted because, if he was prevented from practicing medicine in his home, he would suffer great hardship compared to only negligible harm caused to appellees. The Court of Special Appeals stated:

We conclude that the doctrine has no application to the case at bar. Here Dr. Liu testified that he had spent approximately $15,000 to establish his office. $6,000 of that total was expended prior to June 1973 which was the first time he admitted being aware that appellees were opposed to his home practice. After being so informed, Dr. Liu spent an additional $9,000 on his office apparently without regard for the possible legal validity of appellees' position. The appellees' substantial interest in preserving the residential integrity of their community is not outweighed by appellants' desire to establish a practice in his home.

*Id.* at 193–94, 333 A.2d at 346.

## Private Covenants

The validity of properly created restrictive covenants is well established in Maryland. We stated in *Steuart Transportation Company v. Ashe,* 269 Md. 74, 304 A.2d 788 (1973):

[O]ne owning a tract of land ... may validly impose upon the part granted restrictions upon the use thereof for the benefit of the part retained, and upon the part retained for the benefit of the part granted, or upon both for the benefit of both; that, where the covenants ... are not expressly for or on behalf of the grantor, his heirs and assigns, they are personal and will not run with the land, but that, if in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity....

*Id.* at 88, 304 A.2d at 796–97, quoting *McKenrick v. Savings Bank of Baltimore,* 174 Md. 118, 128, 197 A. 580, 584–85 (1938). In *Jones v. Northwest Real Estate Company,* 149 Md. 271, 280–81, 131 A. 446, 450 (1925), we stated:

[W]e are here dealing with an original grantor, who still owns a considerable part of the land, and the assignees of an original purchaser, and, as the deed specifically states that the covenants are to bind "the grantees, their heirs and assigns," there would seem to be no question, under the authorities, of the grantor's right to enforce the covenants....

The Court of Special Appeals, similarly, stated in *Markey v. Wolf,* 92 Md.App. 137, 149, 607 A.2d 82, 88 (1992), that:

It is, therefore, necessary to construe the meaning of the pertinent provisions of the covenants in order to determine: (1) what, if any, conditions exist affecting the declarant's reservation of plan approval; and (2) whether the facts contained in the respective affidavits of appellants are sufficient to foreclose summary judgment.

For a more complete review of the Maryland law with respect to covenants and uniform plans of development, *see Steuart Transportation,* 269 Md. 74, 304 A.2d 788, and cases therein cited.

In *Steuart Transportation,* 269 Md. at 88–91, 304 A.2d at 797–98, we said, quoting in part from *McKenrick v. Savings*

*Bank of Baltimore,* 174 Md. 118, 126, 197 A. 580, 584 (1938), "that recordation of a deed subjecting land to restrictions afforded constructive notice . . . sufficient to charge such persons with liability in respect to the restrictive covenants." Quoting from *Turner v. Brocato,* 206 Md. 336, 346, 111 A.2d 855, 861 (1955), we commented in *Stewart Transportation* that "[t]he decisions of this Court have long recognized that equity, under appropriate facts, will enforce what variously has been called reciprocal negative easements, implied equitable reciprocal servitudes or merely equities attached to land." *Id.* at 91, 304 A.2d at 798.

In *Belleview Construction Company v. Rugby Hall Community Association,* 321 Md. 152, 156–58, 582 A.2d 493, 495–96 (1990), we said in relevant part:

> The original and extended covenants are covenants running with the land. . . . They are, by their terms, enforceable by the developer, the association, or any lot owner. The covenants were clearly established as part of a general plan of development for this community. . . .

> In construing covenants, "it is a cardinal principle . . . that the court should be governed by the intention of the parties as it appears or is implied from the instrument itself. . . ." This principle is consistent with the general law of contracts. . . .

> The courts seem to have generally recognized that there is no public policy against a fair and reasonable construction, in the light of surrounding circumstances, of restrictions designed, in general, to accomplish the same beneficial purposes as zoning. [Alteration in original.] [Citations omitted.]

Because the facial validity of the covenant at issue in the case at bar is not challenged, except on Fair Housing Act grounds that have already been addressed, we do not have to construe the reasonableness of the restriction at issue in this case. We have noted the general standard for construing

such covenants in our cases, most recently in *Belleview,* *supra.*[8]

The powers given to, and the functions of, the Committee in the case *sub judice,* appear to be as intended by the original declarants. Moreover, they appear to be reasonable. In any event, the covenant is not challenged on its face, except as we have heretofore stated.

## III. Decision of Committee

In respect to whether the Committee actions were reasonable, we said in one of our relatively early cases, *Kirkley v. Seipelt,* 212 Md. 127, 133, 128 A.2d 430, 434 (1957), in reference to covenants regulating the manner and design of structures, that

[t]he language used in the covenants ... makes plain the desire to regulate the construction of the dwellings in such a manner as to create an attractive and desirable neighbor-

---

8. *See Markey,* 92 Md.App. 137, 607 A.2d 82, a case in which the Court of Special Appeals gave an extensive history of this Court's treatment of similar restrictive covenants in Maryland, saying in part:

 A later case, apparently recognizing the reasonableness modification of the strict construction rule, is the often-cited case of *Turner v. Brocato,* 206 Md. 336, 111 A.2d 855 (1955). In that case, the Court said: "This rule of construction [that doubt must be resolved in favor of the alienability of land] bows always to the more fundamental rule that wherever possible effect will be given to an ascertained intention of the parties." *Id.* at 352, 111 A.2d 855....

 . . . .

 ... [T]he Court of Appeals ... recognized the "modern" or "reasonable" rule once again in its most recent case of *Belleview Construction Co. v. Rugby Hall Community Association,* 321 Md. 152, 582 A.2d 493 (1990). The Court stated that it was a "cardinal principle" that the intentions of the parties appearing from, *or implied by,* the instrument controls when covenants are construed and that that language should be considered along with the objects of the parties and the other "circumstances and conditions affecting the parties and the property." *Id.* at 157, 582 A.2d 493. The Court further said that: "The rule of strict construction should not be employed ... to defeat a restrictive covenant that is clear on its face, *or is clear when considered in light of the surrounding circumstances." Id.* at 158, 582 A.2d 493 (emphasis added).

 *Id.* at 154–56, 607 A.2d at 90–92 (alterations in original) (some citations omitted) (footnote omitted).

hood. We think the parties had a right voluntarily to make this kind of contract between themselves; and the covenant does not create any interference with the fee of the property that would require it to be stricken down as against public policy. It does not prevent the owner from conveying the property or impose any unlawful restraint of trade, but affects only its method of use. We hold that any refusal to approve the external design or location . . . would have to be based upon a reason that bears some relation to the other buildings or the general plan of development; and this refusal would have to be a reasonable determination made in good faith, and not high-handed, whimsical or captious in manner.

The trial judge in the instant case relied in large part on the testimony of James Meale, a member of the Committee, which we have repeated, *supra*, in addressing the issue of whether the Committee's decision was reasonable.[9] The court credited Mr. Meale's testimony as we have indicated previously. The trial court noted that Mr. Meale had believed the observations of his neighbors; that Mr. Meale found their information credible.

██ The trial court found Mr. Meale's testimony, that we have heretofore set out, to be "particularly persuasive," finding that the decision of the Committee had been based on trash, noise, parking, traffic, sewage and health concerns. It determined that "[i]n sum, the decision of the Committee was a reasonable, good faith exercise of discretion, based upon legitimate concerns regarding the impact of the facility upon the surrounding neighborhood."

We perceive no error in the trial court's findings as to reasonableness and its issuance of an injunction to enforce the restrictive covenant.

---

9. Apparently, the proceedings before the Committee were not recorded. If they were, we were not directed to the location of any such records in the Extract or their place in the record. Mr. Meale, in his testimony before the trial court relied, at least in part, on the notes he took during the two sessions before the Committee.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.